# EXHIBIT 13



**COHEN TAUBER SPIEVACK & WAGNER P.C.**

Jay Spievack

direct: 212-381-8735
e-mail: jspievack@ctswlaw.com

January 12, 2022

<u>**Via Email**</u>

Dean C. Burnick, Esq.
Prough Law APC
1550 Parkside Drive, Suite 200
Walnut Creek, CA 94596

Jordan E. Harriman, Esq.
Lewis Brisbois Bisgaard & Smith, LLP
633 West 5th Street Suite 4000
Los Angeles, California 90071

***Re:***    ***Spring Mountain Vineyard-Glass Fire Claim: Insurers File No: 001.024327.MI***

Dear Dean and Jordan:

      This letter supplements Spring Mountain Vineyards, Inc.'s ("SMV") October 29 and November 2, 2021, responses to McLarens' September 29, 2021, letter, sent on certain excess insurers' behalf.[1]  For the reasons more fully discussed below, SMV demands that within 30 days, certain excess insurers pay it the replacement costs needed to fully repair and replace property damage that SMV sustained at its covered property due to the Glass Fire.  The payments required are: (i) $2,340,465.14 from Landmark/Kinsale, which represents their remaining 2020-21 reduced policy limit for their $5 million combined first layer excess property policy; (ii) Mt. Hawley's full $10 million policy limit for its 2020-21 second layer excess property policy; and (iii) $9,153,414.20 of Hallmark Specialty/Western World's 2020-21 $10 million combined third layer excess property policy.[2]

---

[1] The excess insurers are Landmark American Insurance Company ("Landmark"), Kinsale Insurance Company ("Kinsale"), Mt. Hawley Insurance Company ("Mt. Hawley"), Hallmark Specialty Insurance Company ("Hallmark Specialty"), Western World Insurance Company ("Western World"), and AXIS Surplus Insurance Company ("AXIS") (collectively, the "Insurers").  The September 29 letter set forth the excess insurers' coverage positions except Mt. Hawley's.  They all, however, retained McLarens to investigate and adjust SMV's Glass Fire-related losses, and McLarens has acted as their agent in relation to all activities since the Glass Fire.

[2] Landmark and Kinsale previously paid SMV $2,659,534.86.  SMV demands that they now pay their full $5 million 2020-21 combined property policy limit, which will exhaust their coverage obligation.  SMV reserves all rights against AXIS should its proven replacement costs exhaust Hallmark Specialty/Western World's $10 million combined third layer excess property policy and refers the Insurers to (i) the 2020-21 Property Policies for the "replacement costs" definition and calculations; and (ii) SMV's November 2, 2021, revised Statement of Loss, prepared by Greenspan.



Dean C. Burnick, Esq.
Jordan E. Harriman, Esq.
January 12, 2022
Page 2 of 11

There is no dispute that SMV purchased and paid the 2020-21 property insurers for the property policies at issue for the policy period July 1, 2020 to July 1, 2021 (the "2020-21 Property Policies").[3]  It is also undisputed that SMV sustained property damage and losses at its covered property due to a covered peril, a wildfire, which occurred on September 27, 2020.

In early October 2020, AJ Gallagher ("AJG") emailed the purported 2020-21 Property Policies to SMV but stated that it had not reviewed them for accuracy.  In an October 13, 2020 conference call, AJG stated that it still had not reviewed the purported 2020-21 Property Policies; however, it also (i) confirmed that on June 30, 2020, prior to requesting that SMV bind its 2020-21 property coverage, it told SMV that the 2020-21 Property Policies would provide blanket coverage for all vineyard property damage; and (ii) told SMV and its representatives that 2020-21 Property Policies did, in fact, provide blanket coverage for property damage and losses at SMV's covered vineyard property.

SMV also hired Greenspan to help it calculate its losses after the Glass Fire.  On October 14, 2020, Greenspan met McLarens at the vineyards to survey SMV's property and inspect the damage.  During that site visit, SMV and McLarens agreed that the property damages and losses at the site likely exceeded $20 million.[4]  Greenspan also told the 2020-21 Property Insurers' agent that SMV had blanket property coverage.  In a follow up email later that day, Greenspan reported that "the carriers are taking the position that if it is not a structure listed/detailed on the Statement of Values it is not something the carriers will consider indemnity for."  Greenspan, however, stated that its "preliminary review of the policy suggests that there is coverage" and that SMV "will be making claim for all structures associated/supporting the insured locations listed on the Statement of Values you had today."

Shortly after October 14, Greenspan told SMV that McLarens did not believe the 2020-21 Property Policies provided blanket coverage.  Since AJG had not completed its accuracy check, SMV requested that AJG work with the 2020-21 Property Insurers to correct the Property Policies and ensure, among other things, that they provided the blanket property coverage that AJG represented it had secured.

The 2020-21 Property Insurers have not provided SMV with their underwriting files and AJG never certified whether the purported 2020-21 Property Policies that it forwarded to SMV, in fact, accurately reflected property coverage that AJG represented it purchased for SMV.

---

[3] In addition to the Insurers' excess property policies, the 2020-21 Property Policies included the primary property policy that First Specialty Insurance Corporation ("First Specialty") issued to SMV.  It is undisputed that the First Specialty's primary policy's $5 million policy limit is exhausted, and it is not a party to this coverage dispute.  In this letter, First Specialty together with the Insurers are referred to collectively as the "2020-21 Property Insurers."

[4] SMV presumes that, on or around its October 14, 2020, site visit, McLarens also provided the Insurers with a written report that summarized its discussions with Greenspan, and its $20 million+ actual property damage assessment.  Regardless, McLarens' knowledge is imputed to the 2020-21 Property Insurers since they retained it to investigate and adjust SMV's losses.



Dean C. Burnick, Esq.
Jordan E. Harriman, Esq.
January 12, 2022
Page 3 of 11

Therefore, SMV continues to investigate whether (i) the 2020-21 Property Insurers should have provided blanket property coverage; and (ii) the property policies in its possession should be reformed or revised to provide blanket property coverage.[5]  SMV reserves all rights against the Insurers under the 2020-21 Property Policies, at law and/or in equity, none of which have been waived.

## The 2020-21 Property Policies

Leaving aside whether the 2020-21 Property Policies should have provided SMV with blanket property coverage, the Insurers' proffered interpretation of their respective limitation of liability provisions is, at best, disingenuous.  The provisions unambiguously show that the Landmark/Kinsale combined $5 million 2020-21 property policy limit is exhausted and Mt. Hawley must pay SMV at least $8,376,009.33 under its 2020-21 excess property policy.

The Landmark and Kinsale combined 2020-21 property policies state, in relevant part, that:

In the event of loss hereunder, liability of the Company shall be limited to the least of the following liability limitation measures in any one "occurrence."

    a.  The actual adjusted amount of loss, less the applicable deductible(s),

    b.  The total stated value for the property involved, as shown on the latest Statement of Values on file with us, less applicable deductible(s),

    c.  The Limit of Liability or Limit of Insurance shown on the face of this Policy or endorsed onto this Policy.[6]

Landmark and Kinsale maintain that, pursuant to subpart b above, they are not obligated to pay SMV for any of the La Perla Winery's $14,516.701.76 in replacement costs because SMV's Statement of Values limits all coverage at that covered property to $4.8 million and First Specialty already paid that amount in full.[7]

---

[5] Blanket property coverage means that the policy or policies together will cover any repair and replacement costs at a covered property up to the applicable aggregate policy limit, regardless of the covered property's individual value listed on SMV's Statement of Values.  Had anyone informed SMV that blanket coverage was not available for its 2020-21 property policies, SMV would have, among other things, substantially increased its individual property values on its Statement of Values.

[6] In their September 29 coverage letter, Landmark misquotes its applicable limitation of liability provision. Specifically, an endorsement modified Landmark policy's limitation of liability provision cited in that letter, and the language in the endorsement mirrors the limitation of liability provision in the 2020-21 Kinsale property policy.

[7] On its Statement of Loss, SMV states that the destroyed La Perla Historic Winery's replacement costs will total $19,316,701.76.  It is undisputed that the La Perla Historic Winery building is covered property and First Specialty

C | T | S | W

Dean C. Burnick, Esq.
Jordan E. Harriman, Esq.
January 12, 2022
Page 4 of 11

Subpart b, however, *only* states that Landmark/Kinsale's collective liability for the La Perla Winery replacement costs is limited to $4.8 million under *their* $5 million combined excess property policy.[8]  It does not permit Landmark/Kinsale to deduct First Specialty's $4.8 million payment from their combined payment obligation.  Had Landmark and Kinsale intended their proposed policy construction, they could have written this provision to read "liability of the Company shall be limited to the stated value for the property involved, as shown on the latest Statement of Value on file with us, less the applicable deductible, and the Company's obligation to pay the stated value for the property involved also will be reduced by the amount of any underlying insurer's payment for that property."  Landmark and Kinsale did not include any such language, and their tortured reading of subpart b must fail.

Therefore, subpart c of the Landmark/Kinsale limitation of liability provisions apply to SMV's Glass Fire-related damages, and not subpart b.  Landmark/Kinsale not only must pay $4.8 million to SMV for the La Perla Winery replacement costs, but also SMV's damage to other undisputed covered property which exceeds $200,000 or the remaining insurance proceeds in the Landmark/Kinsale $5 million 2020-21 first layer excess property policy.[9]

 Thus, interpreted properly, the Landmark/Kinsale 2020-21 property policy's limitation of liability provisions show that (i) the first $10 million in policy coverage would be exhausted because, in addition to their $4.8 million La Perla Winery payment, Landmark/Kinsale is obligated to pay $200,000 to compensate SMV for property damage and losses at the other covered property where the parties do not dispute coverage (*see* the Insurers' September 29 letter at pp.1-3); and (ii) the Mt. Hawley property policy, which provides the next $10 million for covered property damage between $10 million and $20 million, would be triggered.

The Mt. Hawley limitation of liability endorsement provides, in relevant part, that:

If there is a loss under this policy, Mt Hawley will not pay more than the least of the following:

1.  The actual adjusted amount of loss, minus the deductible(s) that applies:

---

paid $4.8 million to SMV for the property damage and losses that SMV sustained at that property due to the Glass Fire, which left $14,516,701.76 in unreimbursed replacement costs less SMV's $500,000 wildfire deductible.

[8] Absent their respective limit of liability provisions, Landmark and Kinsale would have to pay their entire $5 million combined policy limit to SMV because the La Perla Winery replacement costs that remain exceeded their aggregate policy limit.

[9] In their September 29 coverage letter, the Insurers acknowledge that the losses sustained at other covered property exceed $400,000 (*see* pp.1-3).  Since First Specialty paid $4.8 million to cover the La Perla Winery replacement costs, its $200,000 payment covered certain losses sustained at other covered property, and the same should be true for the payment of insurance proceeds under the Landmark/Kinsale 2020-21 first layer excess property policy.



Dean C. Burnick, Esq.
Jordan E. Harriman, Esq.
January 12, 2022
Page 5 of 11

    2.   The Limit of Insurance or the amount of insurance shown in the Declarations pages of this policy or endorsed onto this policy; or

    3.   The stated value for the property involved in the loss as shown on the latest statement of values on file with us, minus the deductible(s) that applies.

Mt. Hawley's subpart 3 also cannot be read to eliminate its liability for the La Perla Winery replacement costs.  Mt. Hawley's limitation of liability provision also *only* limits its *own* payment obligation for any La Perla Winery losses to $4.8 million.

Therefore, the first four insurers (First Specialty, Landmark/Kinsale and Mt. Hawley) should collectively have paid $14,400,000 to SMV for the La Perla Winery replacement costs, leaving $4,016,701.76 in La Perla Winery replacement costs still unpaid if the Insurers also improperly deduct SMV's $500,000 wildfire deductible.  As you both know, however, so far First Specialty is the only 2020-21 Property Insurer to honor its obligation to pay SMV for some La Perla Winery replacement costs.

We note that, absent Mt. Hawley's limitation of liability provision at subpart 3, Mt. Hawley would have to pay SMV's La Perla Winery replacement costs up to at least $8,816,701.76 if its policy provided $10 million in blanket property coverage.  Moreover, the Mt. Hawley $10 million 2020-21 property policy limit would be exhausted because Mt. Hawley also would be obligated to pay its remaining $1,183,298.24 in policy proceeds to compensate SMV for its damages and losses at the other covered property where coverage is undisputed.

Mt. Hawley's $10 million 2020-21 property policy limit, however, *only* will be reduced to $5.2 million after it pays its full $4.8 million liability limitation that attaches to the La Perla Winery replacement costs.  Mt. Hawley's $5.2 million reduced policy limit will, at minimum, be reduced because it must pay SMV for the $3,176,009.33 in property damage at SMV's other covered buildings and structures where no coverage dispute exists (*see* Insurers' September 29 letter at pp.1-3).[10]

Accordingly, Mt. Hawley should, at minimum, pay **$8,376,009.33** to compensate SMV for the property damage and losses that it sustained at covered property due to the Glass Fire after Landmark/Kinsale pay their full **$2,340,465.14** reduced policy limit, which payment will fully compensate SMV for $4.8 million combined first layer excess La Perla Winery liability policy limit plus the additional $200,000 to compensate SMV for some of its losses at its other undisputed covered property.[11]

---

[10]  The Insurers disputed SMV's $578,769.53 replacement cost claim for Miravelle Shop.  During his examination under oath, however, Ron Rosenbrand testified about significant damages to Miravelle Shop that the Insurers' $102,745.32 payment did not cover and should be paid since it is undisputed that the Shop appears on SMV's 2020-21 Statement of Values.

[11]  The 2020-21 Property Policies provide that a New York state or federal court must resolve all coverage disputes and must apply New York law.  Pursuant to New York law, SMV can allocate the 2020-21 Property Insurers'



Dean C. Burnick, Esq.
Jordan E. Harriman, Esq.
January 12, 2022
Page 6 of 11

In sum, the correct and fair interpretation of their respective 2020-21 property policies requires Landmark/Kinsale and Mt. Hawley to pay together, at least, an additional **$10,716.474.47** to compensate SMV for property damage and losses sustained at its covered property.  SMV requests that Landmark and Kinsale pay its $2,340,465.14 remaining policy limit, and that Mt. Hawley pay, at minimum, the $8,376,009.33 for the damages referenced or, alternatively, its full policy limit, within 30 days, for the reasons set forth herein.[12]

## **Disputed Covered Property**

As stated above, Mt. Hawley's 2020-21 excess property policy would be exhausted if AJG either (i) secured the blanket property coverage; or (ii) informed SMV that it was unable to secure blanket coverage and advised SMV to (a) raise its outdated individual property values on its 2020-21 Statement of Values; and (b) add non-listed vineyard property to its Statement of Values.

In its November 2, 2021, Statement of Loss, SMV requested payment of $11,770,559.90 in replacement costs for property damage and losses to the following properties: (a) the Chevalier Red Barn ($2,238,744.08); (b) the La Perla Red Barn ($2,608,338.32); and (c) SMV's trellises and irrigation systems ($6,923,445.83).[13]  The Insurers maintain that these properties are not covered because they are not listed on SMV's Statement of Values.

The 2020-21 Property Policies incorporate First Specialty's primary policy's "covered property" definition, which not only includes buildings and structures described in the Declarations, but also includes, among others, (i) completed additions; (ii) fixtures, including

---

payments to maximize coverage for damaged or destroyed property.  This means that for the $400,000 left in the First Specialty primary policy and the Landmark/Kinsale combined first layer excess property policy (after La Perla Winery payments) should be charged to pay $216,474.75 for the Alba Winery buildings #1-2 replacement costs and $183,525.25 to cover some of the additional Miravelle Shop replacement costs.  Mt. Hawley's payments presumably would then cover the remaining respective replacement costs to repair and replace these covered property unless such costs increase prior to its payment.

[12] The Insurers must pay SMV's replacement costs for any property damage or losses to covered property due to a covered peril.  Mt. Hawley has spent significant time trying to elicit information about what SMV has spent to repair or replace damaged property during its examinations under oath.  SMV will continue to provide this information but note that it is not relevant to the issue of what the Insurers are required to pay pursuant to the 2020-21 Property Policies.  SMV also notes that the Insurers' failure to timely honor their policy obligations to SMV and pay its full repair and replacement costs has severely hindered SMV's efforts to repair its damaged property.

[13] The dollar amounts listed in each parenthetical above are the estimated replacement cost for each of the above-referenced properties or structures, and appear on SMV's November 2, 2021, Statement of Loss.  For SMV's trellises and irrigation damages, Greenspan also broke down its estimated replacement costs as follows: (i) $3,046,316.17 for the trellises and irrigation systems at the La Perla Winery; (ii) $1,246,220.25 for the trellises and irrigation systems at the Chevalier Winery; and (iii) $2,492,440.54 for the trellises and irrigation systems at the Miravelle Winery.  SMV notes that its current replacement costs are subject to modification for, among other things, supply chain issues, increased labor and/or materials costs, and inflation.



Dean C. Burnick, Esq.
Jordan E. Harriman, Esq.
January 12, 2022
Page 7 of 11

outdoor fixtures; and (iii) permanently installed: (a) machinery; and (b) equipment.  Recognizing that the broad "covered property" definition did not support their initial October 14, 2020, coverage position, the Insurers subsequently claim that "completed additions," "outdoor fixtures," and "permanently installed equipment" must be "appurtenant to or attached to" an identified building or structure and/or "service" that building or structure (*see* Insurers' September 29 Letter at p.7). Mt. Hawley also suggests that crop policies and not property policies cover trellises and irrigation systems.

The Insurers' arguments are incorrect and fail for several reasons.  First, the 2020-21 Property Policies do not so limit First Specialty's "covered property" definition.  Second, the Policies also do not exclude or have a sublimit for trellises and irrigation systems.

Had he been asked to during his examination under oath, Greenspan's Tim Larsen would have testified about issues relevant to the Insurers' above-referenced claims.  According to Mr. Larsen, the 2020-21 Property Policies were not winery property policies but standard commercial property policies that were stitched together at the last possible moment for SMV. Based on his experience, Larsen states that the Insurers' interpretation of the "covered property" definition is incorrect because winery property policies that intend to limit that definition provide that "completed additions," "outdoor fixtures," and "permanently installed equipment" must be "appurtenant to or attached to" an identified building or structure and/or "service" only that building or structure.  In contrast, the 2020-21 Property Policies contain no such language that limits the "covered property' definition in this manner.

Mr. Larsen also states that a winery property policy that intended to limit or exclude trellises and irrigation systems would have provided for such limitation or exclusion in the policy.[14]  Absent such language, winery policies are deemed to cover trellises and irrigation systems.

Greenspan's coverage analysis notwithstanding, the 2020-21 Property Policies do not contain language supporting the Insurers' proffered interpretation of covered property. Therefore, under New York law, the "covered property" language must be broadly interpreted to support coverage, if possible, for the Chevalier Red Barn, the La Perla Red Barn and SMV's trellises and irrigation systems.

The destroyed Chevalier Red Barn was, for example, a "completed addition" to the Chevalier Historic Winery.  The Chevalier Historic Winery is listed on SMV's 2020-21 Statement of Values at a value of $3.2 million.  As you know, before it moved all wine processing operations to Miravelle (or Spring Mountain),  SMV conducted some of its wine making and processing operations in the Chevalier Historic Winery building and stored wine crushing and processor equipment used for harvested grapes in that building. This wine crushing

---

[14] Under such circumstances, a winery owner will then buy additional coverage for its trellises and irrigation systems, which may or may not be an endorsement to a crop policy.



Dean C. Burnick, Esq.
Jordan E. Harriman, Esq.
January 12, 2022
Page 8 of 11

and processor equipment includes conveyors belts, sorting tables and assorted machinery used for wine processing.  The facility also stored all microbins used at the Chevalier Winery.

The Chevalier Red Barn was reconstructed to support and services the operations carried out in the Chevalier Historic Winery Building.  The Chevalier Red Barn stored wood wine case boxes, wine bottles and labels that SMV used its wine making and processing operations conducted in the Historic Winery building.  Moreover, the wood Chevalier wine case boxes were placed in, among other places, the ancillary Chevalier Red Barn for safe keeping and shipping after the wines were bottled and labeled in the Chevalier Historic Winery building.  The Chevalier Barn also stored other winery supplies and a generator that provided power for both the Historic Winery building and the Chevalier Red Barn during any power outage.

The Chevalier Red Barn not only serviced the Historic Winery Building's operations, but also was reconstructed to support the Building itself as an appurtenant structure.  The Barn and the Building share electricity and their electrical systems were intertwined, including a common breaker board for both structures. To get adequate water to the Chevalier Historic Winery Building, water pipes, associated plumbing and equipment had to be routed through or under the Red Barn.

Therefore, the Chevalier Red Barn was reconstructed to support and service the Chevalier Historic Winery building and its operations.  Prior to the Glass Fire, it continued to service the Chevalier Historic Winery building's operations and also serviced the Miravelle Winery buildings' operations that involved, among other things, the use of Chevalier produced grapes.[15]

Therefore, the Chevalier Red Barn meets First Specialty's "covered property" definition because it is a "completed addition" and Mt. Hawley should cover its replacement costs.[16]

It also cannot be disputed that SMV's trellises and irrigation systems are "covered property" because they are "permanently installed equipment" and/or "outdoor fixtures" that supported and continue to support the winery operations at the Historic Winery buildings listed

---

[15] SMV has not conducted wine making and processing operations at the Chevalier Historic Winery since it moved those operations to Miravelle.  That, however, does not mean the Chevalier Red Barn was not originally reconstructed to add to and support the Winery buildings' operations and was, and should still be considered a "completed addition."  Additionally, prior to the Glass Fire, the Chevalier Red Barn continued to be an ancillary operation for the Chevalier Historic Winery building while also servicing the wine processing and making operations at the Miravelle covered property.  The Chevalier Red Barn supported the Winery buildings' respective wine making production and processing operations.

[16] The destroyed La Perla Red Barn also meets First Specialty's "covered property" definition.  Here too, the Barn was reconfigured to provide similar services to the La Perla Historic Winery's operations, and subsequently the Miravelle Winery operations as well.



Dean C. Burnick, Esq.
Jordan E. Harriman, Esq.
January 12, 2022
Page 9 of 11

on SMV's Statement of Values.  SMV's trellises and irrigation systems share water and electricity with the Historic Winery buildings.  They serviced and continue to service both the historic buildings' operations and the Miravelle Winery buildings' operations that involve, among other things, the use of the historic winery's various grapes.[17]  They also serviced the Historic Winery buildings' wine processing and making operations and continue to service the Miravelle Winery building's wine making and processing operations today.  They are integrally related to these operations, and none of the Winery buildings' operations (either today or historically) would have occurred without them.

### The Insurers' Payments for Covered Property

The Mt. Hawley required payments above (at pp.5-6, *supra*) will reduce its $10 million excess property policy's limit to $1,623,990.67.  Additionally, the proper interpretation of Mt. Hawley's 2020-21 excess property policy's limitation of liability provision means that it  already will have paid $292,600 to SMV to clean the Chevalier Historic Winery building.[18]   Since the $2,238,744.08 needed to repair or replace the destroyed Chevalier Red Barn exceeds what is left in its policy, Mt. Hawley only has to pay $1,623,990.67 to SMV towards the destroyed Red Barn's still unpaid replacement costs pursuant to subpart b of its liability limitation provision. That payment will exhaust Mt. Hawley's $10 million 2020-21 property policy's limit and trigger the combined $10 million Hallmark Specialty/Western World 2020-21 property policies to cover remaining Glass Fire damages.

The Hallmark Specialty/Western World "Occurrence Limit of Liability Endorsement" provides, in relevant part, that:

1. In the event of loss hereunder, liability of the Company shall be limited to the least of the following in any one "occurrence."

    a. The actual adjusted amount of loss, less the applicable deductible(s) and the primary and excess limits;

    b. The individually stated value for each scheduled unit of Insurance for Building, Personal Property, Time Element or other coverage at the location which had loss shown on the latest Statement of Values on file with the Company, less applicable deductible(s) and the primary and underlying excess limits.  If no value is shown for a scheduled item then there is no coverage for that item; or

---

[17] According to SMV's vineyard manager, the grapes produced at La Perla, Chevalier, Alba and Miravelle are different and each one's products are essential to SMV's various wine production operations since it makes several different types of wine.

[18] The individual property value for Chevalier listed on SMV's Statement of Values was $3.2 million, which was reduced to $2,907,400 after the $292,600 paid for cleaning.  The Insurers incorrectly attribute this cleaning payment to the Miravelle Historic Winery in its September 29 coverage letter (p.2), and not the Chevalier Historic Winery.



Dean C. Burnick, Esq.
Jordan E. Harriman, Esq.
January 12, 2022
Page 10 of 11

    c.   The Limit of Liability as shown of the Declaration page of this policy or as endorsed to this policy.

First, the Hallmark Specialty/Western World liability limit clearly would require payment of the final $4,016,701.76 for the La Perla Winery's replacement costs.  Subpart 1.a requires Hallmark Specialty/Western World to make this combined payment because it is less (i) the applicable $500,000 wildfire deductible; (ii) First Specialty's $4.8 million payment that exhausted its La Perla Winery primary policy limit; (iii) Landmark/Kinsale's $4.8 combined payment that exhausted their respective La Perla Winery first layer excess policy limit; and (iv) Mt. Hawley's $4.8 million payment that exhausted its La Perla Winery second layer excess policy limit.  This payment also would reduce Hallmark Specialty/Western World's La Perla Winery limit to $783,298.24 which, pursuant to subpart 1.b, would be used to pay some of the replacement costs still required to repair and replace either (i) La Perla's damaged trellises and irrigation system; or (ii) the destroyed La Perla Red Barn.

Second, Hallmark Specialty/Western World's combined $10 million excess property policy limit would be reduced to $5.2 million after its $4.8 million La Perla Winery-related limit is exhausted.  The $5.2 million would allow Hallmark Specialty/Western World to pay, pursuant to subpart 1.a, $4,353,414.20 of SMV's remaining property damage and losses, which would consist of: (i) the $614,753.41 still needed to fully repair the destroyed Chevalier Red Barn; (ii) the $1,246,220.25 needed to replace the Chevalier trellises and irrigation systems; and (iii) the $2,492,440.54 needed to replace the Miravelle trellises and irrigation systems.  Therefore, Hallmark Specialty/Western World must pay $9,153,414.20 of their combined $10 million 2020-21 property policy limit to compensate SMV for its Glass Fire-related property damage and losses.

These payments would not, however, exhaust Hallmark Specialty/Western World's combined 2020-21 excess property policy because their combined payment for La Perla Winery-related covered property damage is limited to $4.8 million due to AJG's negligence.   This means that at least $4,871,356.25 La Perla Winery-related covered property damages and losses would not be paid by Hallmark Specialty/Western World and perhaps AXIS.[19]

Accordingly, SMV demands that within 30 days: (i) Landmark/Kinsale pay the $2,340,465.14 remaining in their $5 million combined first layer excess property policy; (ii) Mt. Hawley pay its full $10 million policy limit of its 2020-21 second layer excess property policy;

---

[19] It is possible that SMV might be permitted under New York law to absorb the $846,585.80 needed to exhaust the Hallmark Specialty/Western World $10 million property limit, notwithstanding that AXIS's fourth layer excess property policy provides in its application of underlying insurance provision, that "liability of the Company attaches only after direct, physical loss or damage occurs to property covered under the Policy resulting directly from a peril insured under this Policy and: (1) the loss sustained by the Insured arising out of any one Occurrence exceeds the Limits of Liability of the Underlying Insurance as shown in the Schedule of this Policy plus the applicable amount of the deductible(s)…; and (2) the Companies providing Underlying Insurance have paid the full amount of their respective liability.  If so, AXIS would be obligated to pay $4,024,770.45 to compensate SMV for some of its remaining La Perla Winery-related replacement costs.

C | T | S | W

Dean C. Burnick, Esq.
Jordan E. Harriman, Esq.
January 12, 2022
Page 11 of 11

and (iii) Hallmark Specialty/Western World pay $9,153,414.20 of their 2020-21 $10 million combined third layer excess property policy   Alternatively, SMV demands that Landmark/Kinsale pay their full policy limit and Mt. Hawley pay, at minimum, a $8,376,009.33 partial advance payment to compensate SMV for the property damage and losses that it sustained at covered property due to the Glass Fire.

    Please contact us if you have any questions.  This letter is written without prejudice, and with all rights reserved.

                                                Very Truly Yours,

                                                Jay B. Spievack

Cc: Rebecca Weinreich, Esq.
    Michael D. Prough, Esq.
    Jonathan Goken, Esq.