# EXHIBIT A

# (part 1 of 6)

| | |
|---|---|
| 1 | **STANZLER LAW GROUP** |
| 2 | A Professional Corporation<br>JORDAN S. STANZLER (54620) |
| 3 | jstanzler@stanzlerlawgroup.com<br>390 Bridge Parkway, Suite 220 |
| 4 | Redwood City, CA 94065<br>Telephone:    (650) 739-0200 |
| 5 | |

**ENDORSED**

**JUL 08 2022**

CLERK OF THE NAPA SUPERIOR COURT
BY_____ **T. DELUNA**
DEPUTY

**COHEN TAUBER SPIEVACK & WAGNER, P.C.**
Jay B. Spievack (admitted *pro hac vice*)
jspievack@ctswlaw.com
Jackson S. Davis (admitted *pro hac vice*)
Grace Guo (admitted *pro hac vice*)
420 Lexington Ave., Suite 2400
New York NY 10170-2499

Attorneys for Plaintiff Spring Mountain Vineyard, Inc.

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF NAPA-UNLIMITED JURISDICTION**

| | |
|---|---|
| SPRING MOUNTAIN VINEYARDS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>LANDMARK AMERICAN INSURANCE COMPANY, KINSALE INSURANCE COMPANY, MT. HAWLEY INSURANCE COMPANY, HALLMARK SPECIALTY INSURANCE COMPANY, WESTERN WORLD INSURANCE COMPANY, AXIS SURPLUS INSURANCE COMPANY, ARTHUR J. GALLAGHER & CO., AND DINA SMITH,<br><br>Defendants. | Case No.: 22CV000270<br><br>Action Filed: March 11, 2022<br>[Assigned for all purposes to the Honorable Cynthia P. Smith, Courtroom A]<br><br>**DECLARATION OF MARY SEAVOY**<br><br>Date:   August 4, 2022<br>Time:   8:30 a.m.<br>Dept.:   Courtroom A<br>Hon. Cynthia P. Smith |

I, **Mary Seavoy** declare:

1.      I am the Assistant Secretary of Spring Mountain Vineyard, Inc. ("SMV'). I submit this declaration in support of SMV's opposition to (i) Mt. Hawley Insurance Company's ("Mt.

1

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

Hawley") motion to dismiss the Complaint or alternatively to stay this lawsuit in favor of its later-filed declaratory judgment lawsuit entitled *Mt. Hawley Ins. Co. v. Spring Mountain Vineyard, Inc.*, Case No. 1:22-cv-03191 (S.D.N.Y., filed April 19, 2022) (the "Mt. Hawley Lawsuit"); and (ii) the motion of Landmark American Insurance Company ("Landmark"), Kinsale Insurance Company ("Kinsale"), Hallmark Specialty Insurance Company ("Hallmark Specialty"), Western World Insurance Company ("Western World"), and AXIS Surplus Insurance Company ("AXIS") (collectively, the "20-21 Excess Insurers") to dismiss the Complaint against them (together, the "Motions").[1]  I also submit this declaration to support SMV's request for leave to conduct forum discovery if this Court decides that it cannot deny the 20-21 Excess Property Insurers' Motions solely based on the declarations, exhibits and memoranda submitted alone.

2.      I have been involved in managing SMV's business since approximately April 2000.  I am fully familiar with the facts set forth herein.

## I.      SMV's Insurance Purchasing Practices

3.      SMV does not have any in-house insurance purchasing or claims expertise.  SMV hired Nourse Insurance Brokers, Inc. ("Nourse"), which Arthur J. Gallagher & Co. subsequently acquired (collectively, "AJG") to provide insurance expertise and policy underwriting, negotiation, placement, and claims services.[2]

---

[1] Mt. Hawley and the 20-21 Excess Insurers are referred to collectively herein as the "20-21 Excess Property Insurers." For the policy period July 1, 2020, to July 1, 2021, the primary property insurers were First Specialty Insurance Corporation and Lloyds of London/Beasley (collectively, "First Specialty"), and First Specialty and the 20-21 Excess Property Insurers together are collectively referred to herein as the "20-21 Property Insurers."

[2] AJG and Smith's numerous insurance-related services are detailed in SMV's Complaint (*see* ¶¶ 37, 38, 188), which services are incorporated into my Declaration as if set forth herein.  A true and complete copy of SMV's complaint is attached as Exhibit 1 ("Ex. _") hereto.  For the Court's convenience, certain key portions of exhibits are highlighted.

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

4.      In January 2006, Nourse was SMV's insurance advisor and broker and Dina Smith ("Smith") managed and supervised SMV's account.[3]  In or about mid-May 2009, AJG acquired Nourse, and Smith continued to manage and supervise SMV's account (except when the context requires otherwise, both AJG and Smith will be referred to as "AJG").  At all relevant times herein, AJG, and Smith in particular, held themselves out as experts in providing the above-referenced insurance services to SMV, including in the area of property insurance coverage.  SMV relied entirely on AJG's expertise for its insurance needs, and to ensure that the proper coverage was obtained.

5.      In 2015, I started to manage insurance-related affairs at SMV and my business dealings with Smith and her AJG colleague Jaime Yaudes became more frequent.

6.      For many years before the start of the July 1, 2020, policy period, AJG helped SMV secure approximately $36.6 million in open blanket property coverage to insure for property damages and losses to its covered property, including the buildings and structures identified on SMV'S Statement of Values, its trellises and irrigation systems.[4]  AJG also helped ensure that SMV was provide with consistent policy coverage up to the aggregate limit.  SMV informed AJG that its lender's loan covenants, among other things, required SMV to maintain its open blanket property insurance coverage with consistent property policy terms up to the property policy program's aggregate policy limit.

7.      On SMV's behalf, AJG secured and renewed annually open blanket property coverage with consistent property coverage terms from affiliates of Allianz Global Risks US Insurance

---

[3] I believe that Nourse was SMV's insurance broker well before January 2006.  I found emails, however, that show that I dealt with Nourse as of January 20, 2006.

[4] Blanket property coverage provides coverage for loss to any covered property up to the aggregate policy limit, without reference to the specific covered property and any individual building or structure values listed on SMV's Statement of Values.

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

Company's (collectively, "Allianz").  The property policy program insured SMV's vineyard property located at 2805 Spring Mountain Road, Saint Helena, California, which consists of 850 total acres, including 225 vineyard acres at multiple addresses.  At all relevant times, SMV was (and is) the California resident policyholder, and its insured California vineyard property included numerous buildings, structures, business personal property, trellises, irrigation systems, fixtures, and permanently installed equipment, many of which were subsequently destroyed or damaged during a September 27, 2000 California wildfire known as the "Glass Fire."

8.    One consistent feature of the Allianz program was that the property policies did not, to my knowledge, provide for: (a) disputes to be resolved in a forum other than California state or federal court; and (b) for any law other than California's to apply.

9.    From June 1, 2019, until June 1, 2020 (extended to July 1, 2020), Allianz issued an open blanket property policy to SMV with limits of approximately $36.6 million.   A true and complete copy of the June 2019 to July 1, 2020, property policy (the "Allianz 2019-20 Property Policy") is attached as Exhibit 2.[5]

10.    SMV always expected that California courts applying California law would resolve any coverage dispute concerning property damage or losses at its California vineyard property.  SMV would not have agreed to any venue or applicable law other than California.

## II.    The July 2020 Property Coverage Placement Process

11.    On March 19, 2020, AJG informed SMV that Allianz planned to exit the wine-related business and would not write or renew any wine-related policies.

---

[5] The Allianz June 1, 2019, package program policies (564 pages) included its property and business income policy attached herein.  SMV purchased property program coverage from Allianz for at least 10-12 policy periods before the policy period that commenced on June 1, 2019.

4

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

12.     Consistent with its annual practice, SMV asked AJG to secure an open blanket property program for the 2020-21 policy period that provided coverage that, at minimum, conformed in all material respects to its Allianz 2019-20 Property Policy in force.  At SMV's direction, AJG submitted at least one such property insurance application.  A true and complete copy of the May 15, 2020, Accord Commercial Insurance Application that AJG submitted to Brown & Riding Insurance Services, Inc. ("Brown & Riding") is Exhibit 3 (*see* SMV 02342).[6]

13.     On June 30, 2020, AJG asked SMV to authorize it to bind SMV's property insurance coverage to commence on July 1, 2020.  Prior to this request, the sole property insurance coverage changes that AJG disclosed to SMV were that the 20-21 Property Policies would (i) have a $35,565,435 aggregate policy limit for SMV's covered (commercial) property because the prospective property insurers would not insure SMV's residential property; (ii) have a higher wildfire deductible; (iii) be layered among 9-different insurers; and (iv) would require SMV to pay a significantly higher premium.  True and complete copies of the relevant correspondence is attached as Exhibits 4 to 8 hereto.[7]

14.     In a June 30, 2020, call, I asked AJG to confirm that except for the four (4) disclosed changes, it had secured $35,565,435 in open blanket property coverage that provided SMV with consistent policy coverages up to the property policy program's aggregate limit.  Per SMV's lender's

---

[6] AJG did not provide SMV with the application submitted to Brown & Riding until November 10, 2020.  SMV does not know if AJG submitted additional 20-21 property insurance applications because despite SMV's repeated requests, I am informed that AJG and Smith did not provide us with their entire underwriting files for the policy period July 1, 2020, to July 1, 2021.

[7] AJG and Smith first notified SMV about the four (4) above-referenced changes to our existing property coverage two (2) business days before the Allianz 2019-20 Property Policy expired.  Smith's June 26, 2020, email was sent out on a Friday night at 7:45 pm CT (Ex. 4).  In her June 29 email (at 11:32 pm CT), Smith informed me that the premium for 20-21 property policy premiums would be approximately $700,000 and the wildfire deductible would be increased to $500,000 (Ex. 5).  This was (a) approximately $600,000 more than the Allianz 2019-20 Property Policy premium; and (b) at least $400,000 more than that Policy's deductible for wildfires.

5

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

requirements, I needed confirmation that the new property coverages conformed in all other material respects to the Allianz 2019-20 Property Policy program.

15.     Smith told me that AJG had secured the requested coverage.

16.     Prior to July 1, 2020, AJG did not notify SMV that any of the 20-21 Property Insurers sought to include a provision that would (a) require SMV to litigate coverage disputes in a non-California venue; and (b) apply another state's law to any such coverage dispute about property damages and losses at SMV's California property.  SMV would not have agreed to any venue or applicable law provision other than California and any alleged provision was not freely negotiated or discussed with SMV.  Had it been discussed, SMV would have insisted that any venue or applicable law provision that provide for any state other than California be removed.[8]

17.     Relying upon AJG's representations, SMV authorized AJG on June 30, 2020, to accept the property insurance coverage that AJG said the 20-21 Property Insurers promised to provide to it.  Exhibit 9 is a true and complete copy of SMV's June 30, 2020, authorization to accept that property insurance coverage.[9]

---

[8] SMV does not know what, if any, discussions occurred, or documents were exchanged between or among the 20-21 Property Insurers and their agents and AJG about the 20-21 property insurance coverage prior to June 30, 2020.  As of this Declaration's date, SMV only knows what AJG told it about the 20-21 property insurance coverage; and (b) what SMV's representatives learned from documents that AJG subsequently provided to SMV and its representatives on November 9-10, 2020, including Ex. 3.

[9] I am informed in relation to its Motion, Mt. Hawley submitted a Property Insurance Quotation that First Specialty purportedly issued to Brown & Riding on June 25, 2020, and which expired on July 1, 2020.  No one provided SMV with this First Specialty Property Insurance Quotation before Mt. Hawley submitted it with its Motion.  SMV also was not provided prior to June 30, 2020 with any Excess Property Insurance Quotations from the 20-21 Excess Property Insurers or their representatives.  SMV did not know, work with or hire Brown & Riding at any time. In fact, AJG and Smith had only one email that referred to Brown & Riding before June 30, 2020, and I would have concluded that Brown & Riding was another property insurance company had I paid any attention to that reference. If AJG decided to use Brown & Riding to secure Property Insurance Quotes, SMV would have expected AJG to review any such quotes and ensure that they were either (i) in accord with SMV's requests and requirements; (ii) disclosed and approved by SMV before it accepted such coverage; or (iii) rejected if not consistent with SMV's requests and requirements.

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

1        18.     On July 15, 2020, AJG emailed SMV and attached invoices, finance agreements and

2  insurance binders for the July 1, 2020, to July 1, 2021, Property Policies.  Exhibit 10 is a true and

3  complete copy of the July 15 email and attachments.

4        19.     SMV did not look at or review the 20-21 property insurance binders because: (a) SMV

5  did not have any in-house insurance expertise; and (b) AJG agreed to provide this service to SMV.

6  Pursuant to our agreement, SMV relied on AJG and, in particular, Smith to (i) ensure that the

7  property insurance binder accurately reflected the desired property coverages; (ii) inform SMV of any

8  mistakes, potential discrepancies, or inconsistent property coverage terms; and (iii) contact the 20-21

9  Property Insurers or their representatives to ensure that the final 20-21 Property Policies were

10  corrected to reflect the promised property insurance coverage.[10]

11        20.     SMV expected that Smith reviewed the binders and either (a) confirmed they were

12  correct; or (b) contacted or would contact the relevant 20-21 Property Insurers to correct any

13  mistaken terms or coverages.  AJG never informed SMV of any mistakes in the 20-21 property

14  insurance binders or the need to correct any inaccuracies therein.  Therefore, SMV assumed that the

15  property insurance binders either: (a) correctly reflected the promised property insurance coverage

16  that SMV accepted on June 30, 2020; or (b) AJG contacted the 20-21 Property Insurers to correct any

17  inaccuracies before the final 20-21 property policies were issued.

---

[10] I am informed that the 20-21 property insurer binders show that: (a) none of the 20-21 Excess Property Insurers' binders, in fact, specifically mention the inclusion of a New York forum selection or New York choice of law provision in their respective property insurance policies; and (b) Landmark, Kinsale, Hallmark Specialty, Western World and AXIS actually reference their own forms in which they specifically agree to submit to the jurisdiction of California courts.

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

**III.**     **Coverage for The Glass Fire**

21.     On September 27, 2020, the Glass Fire damaged or destroyed SMV's covered property.  At the time that the Glass Fire occurred, none of the 20-21 Property Insurers had provided SMV or, to my knowledge, AJG with any of the purported 20-21 Property Policies.

22.     On or about October 1, 2020, SMV asked AJG to provide the 20-21 Property Policies. In two October 2 emails, AJG provided SMV with a copy of the purported 20-21 Property Policies. AJG's emails indicated that the policies were provided at SMV's request before AJG conducted its policy review process.  AJG stated that it was "unable to verify the [policies'] accuracy at this time," but "we will check these policies as soon as possible, and confirm to you that they have been checked, and identify any discrepancies."  Those two emails are attached as Exhibit 11.

23.     Shortly after the Glass Fire, SMV hired the Greenspan Company/Adjustor International ("Greenspan") to help it: (a) quantify its losses due to the Glass-Fire; (b) prepare its Glass Fire insurance claims; and (c) deal with the 20-21 Property Insurers and their public adjustor at McLaren Insurance ("McLaren").  We also hired Cohen Tauber Spievack & Wagner PC ("CTSW") to act as SMV's coverage counsel.  On October 8, 2020, CTSW informed Greenspan and SMV that McLarens was expected to validate for First Specialty, at its first site visit, that there was enough damage for First Specialty to immediately pay its $5 million limit and leave further coverage to the 20-21 Excess Property Insurers.

24.     On October 13, 2020, SMV's claims team (SMV, Greenspan, AJG and CTSW) held a conference call to discuss coverage for SMV's Glass Fire-related property damage and losses. During that call, AJG told SMV, Greenspan and CTSW that AJG had not yet reviewed the purported 20-21 Property Policies to confirm that they accurately provided the promised property coverages that SMV accepted on June 30, 2020.  AJG, however, told SMV that they would perform their policy

8

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

check process and inform SMV's claims team of any inaccuracies.  During that conference call, Smith told SMV, Greenspan and CTSW that (i) SMV had open blanket commercial property coverage for the 20-21 policy period; and (ii) acknowledged that on June 30, 2020, she told me that SMV had open blanket property coverages that conformed in all material respects to the Allianz 2019-20 Property Policy's coverages.[11]

25.     On October 14, 2020, Greenspan met McLarens at SMV's California property.  On the 20-21 Property Insurers' behalf, McLarens requested to conduct an initial site visit to inspect SMV's property damage and losses sustained during the Glass Fire.  At SMV's request, Greenspan requested that the 20-21 Property Insurers provide SMV with a $7 million advance payment against its covered property destroyed or damaged during the Glass Fire.  According to Greenspan's Tim Larsen, McLarens' Steve Bluemel acknowledged that the vineyard's total property damages and losses likely exceeded $20 million.  Exhibit 12 is a true and complete copy of Tim Larsen's October 14, 2020, email to Steve Bluemel, which copied SMV.

26.     From October 2020 until September 29, 2021, SMV sought to have the 20-21 Property Insurers provide advance payments to it against its covered property destroyed or damaged due to the Glass Fire.  SMV sought to maximize coverage while it waited for the 20-21 Property Insurers to complete their respective coverage investigations.

27.     First Specialty did not dispute coverage and paid its $5 million limit to SMV.

28.     From October 2020 until the present, SMV has maintained that: (i) on June 30, 2020, it accepted approximately $35.6 million in open blanket commercial property coverage that except for the above-referenced four changes, conformed in all material respects to the Allianz 2019-20

---

[11] During our conference call, we did not discuss the four above referenced coverage changes that AJG disclosed to SMV on or before June 30, 2020 (*see* ¶ 13).  SMV does not, however, dispute that those changes were disclosed to it before it accepted the property insurance coverage on June 30, 2020.

9

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

Property Policy; and (ii) the purported 20-21 Property Policies are not enforceable contracts because they do not reflect the promised property coverage that SMV accepted.  Since the Glass Fire occurred, SMV has repeatedly informed the 20-21 Property Insurers and McLarens that they are obligated to pay SMV for property damage and losses at its covered property due to the Glass Fire up to the property insurance coverage $35,565,435 open blanket aggregate limit.[12]

29.     SMV consistently has disputed that the purported 20-21 Excess Property Policies are the enforceable insurance contracts.  SMV also informed the 20-21 Excess Property Insurers and McLarens that it has reserved all of its rights to investigate and prove that the 20-21 Property Insurers sold SMV property insurance coverage that failed to conform in all material respect to the Allianz 2019-20 Property Policy; and (ii) SMV is entitled to the promised property insurance coverage to pay for its property damage and losses sustained caused by the Glass Fire (*see, e.g.,* Exhibits 2, 3 & 9, *supra*).

30.     From approximately mid-October 2020, SMV has been aware that the 20-21 Excess Property Insurers likely would maintain that the purported 20-21 Excess Property Policies are the applicable insurance contracts.  On October 21, 2021, Kinsale sent a reservation of rights letter to SMV that referenced certain of its purported 20-21 Excess Property Policy's provisions.  Kinsale also indicated that it continued to investigate SMV's Glass Fire-related claims.  Exhibit 13 is a true and complete copy of Kinsale's October 21 reservation of rights letter.

31.     On November 24, 2020, SMV told AJG that they would need to "inform the carriers and wholesale brokers that that the insurance binders and the proposed policies or policy forms

---

[12] SMV never agreed, in writing or otherwise, to modify the property insurance coverage that it accepted on June 30, 2020 (*see* ¶¶ 14-17, *supra*).  SMV believes that the 20-21 promised property coverage is better than the Allianz 2019-20 Property Policy in certain respects, which I am informed is reflected in the purported 20-21 Property Policies' declarations. For its part, AJG never informed SMV that it completed its policy check process or that the purported 20-21 Excess Property Policies accurately reflected the property coverage that SMV accepted on June 30, 2020.

10

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

currently under review at AJG do not accurately reflect the blanket coverage that the carriers agreed to provide SMV." SMV also told AJG to inform the 20-21 Property Insurers and Brown & Riding that "SMV and [AJG] request that the carriers provide the 2020-21 policies with the blanket coverage and terms and conditions agreed to as reflected in both the insured's 2020-21 application and the insurers' response thereto during the policies' underwriting."[13] Exhibit 14 is a true and complete copy of SMV's November 24, 2020, email to AJG.

32.     In or about January 2021, First Specialty's primary coverage was exhausted. Thereafter, Greenspan urged McLarens to get the first layer excess insurers (Landmark and Kinsale) to provide SMV with additional advance payments up to their applicable combined $5 million first layer excess policy limit ($2.5 million each).

33.     On March 24, 2021, Landmark provided Greenspan with its reservation of rights letter, indicating that it still was investigating SMV's loss and reserved all of its rights regarding coverage. Exhibit 15 is a true and complete copy of Landmark's March 24, 2021, reservation of rights letter.

34.     On July 13, 2021, SMV submitted its Sworn Statement of Partial Proof of Loss. In the cover email, Greenspan reiterated SMV's coverage position and noted that the 20-21 Property Insurers have not provided a coverage response. SMV periodically revised its Sworn Statement of Partial Proof of Loss and reiterated its coverage position and demand for open blanket coverage. Exhibit 16 is a true and correct copy of SMV's Sworn Statement in Partial Proof of Loss and Greenspan's July 13 email. Exhibit 17 is a true copy of SMV's August 26, 2021, Revised Sworn

---

[13] From Smith's November 24 email (attached at Exhibit 14), she apparently discussed SMV's coverage position with the 20-21 Property Insurers and their representatives. Based on AJG's actions and Smith's October 13 representations, SMV originally believed that AJG was part of its claim's team after the Glass Fire occurred, but that belief proved incorrect in or about late November 2020.

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

Statement of Partial Proof of Loss and SMV's counsel Jay Spievack's September 27, 2021, email to McLarens' Mike Vadney with the attachments.

35.     On August 5, 2021, Mt. Hawley provided Greenspan with its reservation of rights letter.  Mt. Hawley stated that it intended to investigate SMV'S Glass Fire-related claims and requested that SMV produce documents and submit to examinations under oath as part of Mt. Hawley's claims investigation (*see* Adam Kotara Declaration, Exhibit 8).

36.     On September 29, 2021, McLarens sent Greenspan a coverage position letter on behalf of Landmark, Kinsale, Hallmark Specialty, Western World and AXIS, which accepted, in part, and denied, in part, coverage for SMV's Glass Fire-related claims.  In its denial, McLarens essentially stated that the 20-21 Excess Insurers (except for Mt. Hawley) are not obligated to pay SMV more than $7,659,534.86 for its Glass Fire property damage and losses.[14]  Exhibit 18 is a true and complete copy of McLarens' September 29, 2021, letter.[15]

37.     By letter dated October 29, 2021, SMV responded to McLarens' coverage denial letter.  In a November 2, 2021, email, SMV submitted a revised Sworn Statement of Loss and revised Statement of Loss.  On January 12, 2022, SMV provided the 20-21 Excess Property Insurers with a letter supplementing its coverage positions.  Exhibits 19-21 are true and correct copies of this correspondence.

---

[14] As of the date of my Declaration, I understand that Mt. Hawley (i) claims that it still investigating coverage for SMV's Glass Fire-related claims; and (ii) has not issued a letter in which it either accepts coverage, in whole or in part, and/or denies coverage for SMV's claims. I believe Mt. Hawley's claim is false and that it has used SMV's obligation to cooperate it a legitimate claims investigation for improper purposes. On November 18, 2021, I appeared for an examination under oath to cooperate in Mt. Hawley's alleged "claims investigation." At my examination, it became readily apparent to me that Mt. Hawley already decided to deny coverage on the exact same grounds asserted by McLarens' September 29, 2021 letter.

[15] As a result, Landmark and Kinsale have not exhausted their $5 million combined first layer excess policy limit and another $2,340,465.14 must be paid before Mt. Hawley's second layer excess property insurance coverage is triggered.

12

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

**IV.**      **The Purported 20-21 Excess Property Policies**

38.      As discussed herein (at ¶¶ 28-39, 31-32, 34, 37, *supra*), SMV has never agreed that the purported 20-21 Property Policies (including the purported 20-21 Excess Property Policies) are the operative property insurance contracts for the policy period July 1, 2020, to July 1, 2021.  Subject to its reservation of rights, SMV also has maintained that the 20-21 Excess Property Insurers incorrectly interpret their own respective purported 20-21 Excess Property Policies (*see, e.g.,* Exhibits 19 & 21).

39.      For instance, assuming that the purported 20-21 Excess Property Policies are the operative contracts—and SMV does not—I am informed that the purported (i) 20-21 first layer excess property policies expressly state that Landmark and Kinsale agree to submit to jurisdiction of the California courts; (ii) 20-21 third layer excess property policy also expressly states that Hallmark Specialty agrees to submit to the jurisdiction of the California courts; and  (iii) 20-21 third layer Western World and the 20-21 fourth layer AXIS both have endorsements in which they expressly agree to submit to the jurisdiction of the California courts.  In each case, I am informed that these purported 20-21 property policies state that policy language in their respective policies controls.  By letter dated April 14, 2022, SMV asked the 20-21 Excess Insurers to submit to the jurisdiction of the state courts located in Napa County, California.  A true and complete copy of SMV's April 14, 2022, letter is Exhibit 22.[16]

40.      SMV never would have agreed to litigate a future property insurance coverage dispute involving property damage and losses to its California property due to a California wildfire with

---

[16] None of the 20-21 Property Insurers, AJG, Smith or anyone else provided SMV with any 20-21 proposed Property Policy, any Specimen Policy or purportedly final Policy terms before the Glass-Fire (*i.e.,* September 27, 2020).  Since the purported 20-21 Property Policies were sent after the Glass Fire, SMV also does not know if any of the 20-21 Property Insurers added new provisions, altered existing ones, or removed promised coverages post-Fire to attempt to limit their exposure.  SMV does not know if Mt. Hawley added New York forum and New York choice of law provisions after the Glass-Fire because it believes New York law and a New York forum are more favorable to insurers.

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

different 20-21 Excess Property Insurers in different states applying different state laws to the same

coverage issues.  For instance, SMV would have expected (and required) that all of the Excess

Property Insurers (including Mt. Hawley) would expressly consent to the jurisdiction and venue of

the California state and federal courts since I am informed that the first-layer excess property insurers

(Landmark and Kinsale) and the third-and fourth-layer excess insurers (Hallmark Specialty, Western

World and AXIS) all consent to that jurisdiction and venue of the California courts.  SMV expected

that any such future coverage dispute with its 20-21 Property Insurers would be fully resolved in a

California court applying California law.

**V.**     **This California Coverage Dispute Has No Connection to New York State**

41.     SMV is a California policyholder.  The property insured and damaged or destroyed is

a vineyard in Napa County, California.  The covered peril, the Glass Fire, was a California wildfire.

SMV and its insured property have no relationship to New York state and did purchase property

insurance coverage in or for New York.  The 20-21 property insurance coverage was issued and

delivered to SMV's California office and its management company's Chicago, Illinois offices.

42.     I am informed that none of the 20-21 Excess Property Insurers are incorporated in

New York or have their principal place of business in New York.  To my knowledge, none of their

underwriters or claims personnel with information relevant to this coverage dispute live or work in

New York state.  To my knowledge, none of their documents relevant to this dispute are located in

New York.[17]  I suspect that some or all of the 20-21 Excess Insurers sell, deliver, or issue property

insurance coverage to other policyholders in all 50-states (including New York), but that business, if

any, is not connected in any way to this transaction or dispute.

---

[17] I also am informed that First Specialty does not have its place of incorporation or principal place of business in New
York, and none of the individuals working on the SMV account live or work in New York.

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

43.     This is a California insurance transaction and coverage dispute involving a California policyholder (SMV) and property.  I am aware that 20-21 Excess Property Insurers and/or their representatives have visited the property approximately 12 or more times to view the property and its operations and to inspect the damage caused by the Glass Fire.

44.     To my knowledge, all of the relevant witnesses and documents are located either in California or in states other than New York.  I am informed that (i) no party or, to our knowledge, non-party witnesses are located in New York; and (ii) almost no party or non-party witnesses could be compelled to give live testimony at trial in New York.  In contrast, I am informed that live witness testimony would be readily available in this Napa County Court because many witnesses and third-party witnesses are in California or would voluntarily agree to appear and offer live testimony.

45.     All of SMV's employees are located at or near SMV's property in California.  All of SMV's documents are located at or near SMV's California office or at its management company's office in Chicago, Illinois.  Don Yannias and I are located in downtown Chicago, but we are willing to appear in person to testify at a California trial.  SMV's employee witnesses live and work near the California vineyard, and none of SMV's officers or employees resides or works in New York.  SMV's personnel with relevant factual knowledge include: (i) President Don Yannias; (ii) former Chief Financial Officers, Jim Meredith; (iii) Director of Vineyard Operation, Ron Rosenbrand; (iv) Chief Winemaker Barrett Anderson; (iv) potential other SMV California-based employees; and (v) me.[18]

46.     Relevant AJG personnel and documents are located in its California offices and none of AJG's relevant witnesses and documents are located in New York.  To my knowledge, AJG's witnesses also work or worked and live in California, including: (i) Managing Director Dina Smith;

---

[18] Mr. Meredith recently retired, but lives near the vineyard.

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

(ii) former Client Services Supervisor/Commercial Insurance Jamie Yaudes; and (iii) Area Executive Vice President Management Liability or Vice President Corporate Claims Counsel Linda Pierce. From our discussions and correspondence, I learned Smith works in AJG's San Francisco and Lafayette, California offices and lives in California.  Ms. Yaudes works in AJG's Lafayette, California office.  Ms. Pierce works in either AJG's Glendale California office and/or at Gallagher Bassett's Rolling Meadows Illinois office.

47.     Greenspan personnel and documents are located in its California offices and none of Greenspan's witnesses and documents are located in New York.  To my knowledge, Greenspan's witnesses also work and/or live in California, includes its: (i) Executive General Adjustor Tim Larsen; (ii) Property Damage Estimator JD Franco; (iii) its Inventory Specialist Jenny Schultz; and (iv) General Counsel Paul Migdal.

48.     To my knowledge, McLarens' personnel and documents are located in its California offices and none of McLarens' witnesses and documents are located in New York.  To my knowledge, Greenspan's witnesses work in California, including (i) Steve Bluemel; and (ii) Mike Vadney.

49.     To my knowledge, Brown & Riding personnel and documents are located in its Los Angeles, California, Portland, Oregon and Seattle, Washington offices and none of Brown & Riding's witnesses and documents are located in New York.  To my knowledge, Brown & Riding's witnesses include: (i) Chris Bading in its Portland offices; (ii) Teresa Cannon and Turner Chatterton in its Seattle offices; and (iii) personnel in its Los Angeles office.

50.     In connection with SMV's operations, any third-party businesses' personnel involved in its operations work in California.  SMV also hired many third-party businesses to help it repair or replace destroyed or damaged property after the Glass Fire.  All of these businesses' personnel work

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

in California near SMV's property.  For instance, I reviewed letters from Mt. Hawley's counsel to SMV's coverage counsel in relation to its request that SMV provide Mt. Hawley with additional third-party documents and communications in SMV's possession for its alleged coverage investigation (*see* Ex. 40).  All of the companies identified in Mt. Hawley's additional document requests work (and presumably live) in California, many of them near the SMV's vineyard property.[19]  None of them work or live in New York.

51.     I am informed that the 20-21 Excess Property Insurers' binders show that none of their identified underwriters work in New York.  I am informed that the underwriters identified are: (i) Landmark's RSUI office in its Sherman Oaks, California; (ii) Kinsale's Carmen Dickey. Executive Underwriter-Commercial Lines in its Richmond, Virginia office; (ii) Mt. Hawley's Risk Insurance Services, LLC in its Atlanta, Georgia offices; (iv) Western World's Validus Specialty in its Boston, Massachusetts offices; and (v) AXIS in its Beverly Hills, California offices.  I am informed that First Specialty's Swiss Re Excess & Surplus Kansas City, Missouri offices appears to have performed the underwriting on First Specialty's purported 20-21 Primary Property Policy.

{Remainder of the page left intentionally blank.}

---

[19] Mt. Hawley conducted four examinations under oath, including mine.  Mt. Hawley asked about third-party businesses that provide services to SMV in relation to its operations and the repair and replacement of property damaged during the Glass Fire.  SMV anticipates that many of these individuals will be called as witnesses.

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

1       I declare under penalty of perjury under the laws of the State of California that the foregoing

2  statements are true and correct.  Executed on July __, 2022, in Chicago, Illinois.

Mary Seavoy

**Declaration of Mary Seavoy in Opposition to All Insurer Defendants' Motions**

# EXHIBIT 1

**STANZLER LAW GROUP**
A Professional Corporation
JORDAN S. STANZLER (54620)
jstanzler@stanzlerlawgroup.com
390 Bridge Parkway, Suite 220
Redwood City, CA 94065
Telephone:    (650) 739-0200

**COHEN TAUBER SPIEVACK & WAGNER, P.C.**
Jay B. Spievack (*pro hac vice forthcoming*)
jspievack@ctswlaw.com
Jackson S. Davis (*pro hac vice forthcoming*)
Grace Guo (*pro hac vice forthcoming*)
420 Lexington Ave., Suite 2400
New York NY 10170-2499

Attorneys for Plaintiff

FILED
3/11/2022 3:30 PM
Clerk of the Napa Superior Court
By: Lori Walker, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF NAPA

## UNLIMITED JURISDICTION

| | |
|---|---|
| SPRING MOUNTAIN VINEYARDS, INC., <br><br> Plaintiff, <br><br> v. <br><br> LANDMARK AMERICAN INSURANCE COMPANY, KINSALE INSURANCE COMPANY, MT. HAWLEY INSURANCE COMPANY, HALLMARK SPECIALTY INSURANCE COMPANY, WESTERN WORLD INSURANCE COMPANY, AXIS SURPLUS INSURANCE COMPANY, ARTHUR J. GALLAGHER & CO., AND DINA SMITH, <br><br> Defendants. | Case No.:  22CV000270 <br><br> **COMPLAINT FOR:** <br><br> **1. DECLARATORY JUDGMENT;** <br> **2. BREACH OF CONTRACT;** <br> **3. ALTERNATIVE BREACH OF CONTRACT;** <br> **4. ALTERNATIVE DECLARATORY JUDGMENT;** <br> **5. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** <br> **6. NEGLIGENT MISREPRESENTATION;** <br> **7. NEGLIGENCE;** <br> **8. NEGLIGENT MISREPRESENTATION; AND** <br> **9. BREACH OF FIDUCIARY DUTY** |

COMES NOW Plaintiff Spring Mountain Vineyard, Inc. ("SMV"), by and through its

attorneys, for its Complaint for breach of contract, declaratory judgment, breach of the implied

covenant of good faith and fair dealing, and negligent misrepresentation, against Landmark American

Insurance Company ("Landmark"), Kinsale Insurance Company ("Kinsale"), Mt. Hawley Insurance

Company ("Mt. Hawley"), Hallmark Specialty Insurance Company ("Hallmark Specialty"), Western

World Insurance Company ("Western World") and AXIS Surplus Insurance Company ("AXIS,"

together with Landmark, Kinsale, Mt. Hawley, Hallmark, Western World, the "Insurer Defendants"),

and for negligence and negligent misrepresentation against Arthur J. Gallagher & Co. ("AJG") and

Dina C. Smith ("Smith," together with the Insurer Defendants and AJG, "Defendants"), and, in

support thereof, states as follows:

## <u>NATURE OF THE ACTION</u>

1.      This is a civil action arising out of the Insurer Defendants' wrongful failure and refusal

to pay SMV full policy limits of coverage under their respective excess "all risk" July 1, 2020-July 1,

2021, excess commercial property insurance policies (the "20-21 Excess Property Policies") insuring

SMV's vineyard that are part of a $35,565,435 program (the "Insurance Program").  SMV incurred

insured losses far exceeding the Insurance Program (and the Insurer Defendants' respective portions

of that aggregate limit) due to property damage and loss resulting from the September 27, 2020

"Glass Line Fire" (herein, the "Fire").

2.      SMV timely submitted claims to the Insurer Defendants for its losses caused by the

Fire and provided all necessary proofs of loss demonstrating that the covered losses far exceeded each

of the Insurer Defendants' respective policy limits.

3.      The primary insurers, First Specialty Insurance Corporation together with Beazley

Lloyds Syndicate 2623/623 (collectively, "First Specialty"), advanced payments to SMV to cover the

losses, damages, or destruction to SMV's property due to the Fire.   First Specialty did not dispute

coverage and paid its full $5 million policy limit.

4.      The 20-21 first layer excess insurers, Landmark and Kinsale, also advanced payments

to SMV to cover the losses, damages, or destruction to SMV's property due to the Fire.

5.      The Insurer Defendants' respective "all risk" 20-21 Excess Property Policies cover loss, damage, or destruction to SMV's property caused by the Fire, including the replacement costs and/or actual cash value of such property, and in or around late October 2020, the Insurer Defendants acknowledged through their insurance adjuster McLarens that the actual cash value of property damage and losses from the Fire likely exceeded $30 million.

6.      Despite their obligation to pay SMV's losses, Landmark and Kinsale wrongfully refused to pay their full $5 million combined policy limit to SMV.  Landmark and Kinsale asserted coverage defenses and limitations that have no basis under their 20-21 combined first layer excess property policies and, on information and belief, materially misrepresented their promised coverages in an attempt to limit their insurance payments to $2,659,534.32.  Consequently, Landmark and Kinsale are in breach of their policies, and SMV is entitled to recover at least $2,340,465.68 in insurance proceeds to pay the entire $5 million combined policy limit, plus attorneys' fees and costs.

7.      Mt. Hawley anticipatorily breached its coverage obligations owed to SMV under its 2020-21 second layer excess property policy as it will not pay SMV's losses.  Mt. Hawley also has violated its obligation of good faith and fair dealing owed to its policyholder.  For instance, despite its clear intent not to pay any of its $10 million policy limit to SMV, Mt. Hawley continued to request that SMV produce documents and submit to multiple examinations under oath long after it had completed any legitimate claims investigation to determine whether it would provide coverage.  In fact, Mt. Hawley's coverage investigation is a total sham.  Consequently, SMV seeks an order declaring that Mt. Hawley (a) has breached its second layer 20-21 excess property policy, violated its implied covenant of good faith and fair dealing, and engaged in bad faith claims handling practices; and (ii) must pay its full $10 million second layer excess property policy limit to SMV, plus attorney's fees and costs.

8.     The third combined layer excess property insurers Hallmark Specialty and Western World and the final fourth layer excess property insurers AXIS also have denied any obligation to pay SMV's losses under their respective 20-21 excess property policies.  Consequently, SMV seeks an order declaring that (a) Hallmark Specialty and Western World breached their obligation to pay SMV up to $10 million for its losses caused by the Fire, plus attorney's fees and costs; and (ii) AXIS breached its obligation to pay SMV up to $5,565,435 for its losses caused by the Fire, plus attorney's fees and costs.

9.     California law implies a duty of good faith and fair dealing into every contract, including insurance policies.  Among other things, this duty obligates the Insurer Defendants to (a) do nothing that would deprive the policyholder of their contractual rights; (b) provide the coverage the policyholder's request or to provide fair notice to their policyholder regarding any proposed changes or limits in that coverage; (c) perform full, fair, thorough, and prompt investigations of insurance claims; (d) investigate all possible bases for coverage; (e) seek out information that is supportive of coverage; (f) pay all undisputed amounts promptly and without delay; and (g) prohibits the Insurer Defendants from elevating their interests above their policyholder's interests.  By failing and refusing to promptly pay SMV's proven, covered losses or provide a timely coverage response, and instead hiding behind specious defenses that misrepresent the facts about the coverages available to SMV and, on information and belief, the coverages promised to SMV, the Insurer Defendants have breached their obligations to act in good faith and forced SMV to bring this litigation.

10.     In sum, the Insurer Defendants have individually and collectively breached the 20-21 Excess Property Policies by failing and refusing to honor their respective policy provisions and to pay their respective full policy limits to SMV for the proven, covered losses.

11.     SMV's insurance broker, AJG, and its account manager, Smith, are joined in this civil action because AJG and Smith are obligated to pay any losses or damages incurred by SMV due to

the Fire that the Insurer Defendants do not otherwise pay to SMV. AJG and Smith had assured SMV that it had secured materially the same (if not better) commercial property policy coverages for the 2020-21 policy period than those in force for the expiring 2019-20 policy period. Except for four specific changes discussed below, AJG and Smith never (i) informed SMV about any other material changes in its program coverages; or (ii) suggested any steps that SMV might take to secure similar coverage if, in fact, any of the terms, conditions, endorsements, exclusions, and limits in the 20-21 Property Policies materially differed from SMV's 2019-20 property policy coverages and open blanket limits.

12.     For at least 15, and perhaps 25 years preceding the July 1, 2020 policy period, SMV purchased property policies providing "open" blanket coverage for the property damages and losses for its vineyard commercial and residential property up to the approximately $36.6 million aggregate policy limit.[1] During this earlier period, AJG and its predecessor acted as SMV's insurance broker of record.

13.     For the policy period that commenced July 1, 2020, SMV sought the same approximately $36.6 million blanket property program coverage that was previously in effect. Neither Smith nor anyone else at AJG informed SMV of any material changes in its commercial property coverage for the vineyard property except for the four specific changes discussed below. Rather, AJG and Smith told SMV that it secured the open blanket property program coverages for SMV's commercial vineyard property for the July 1, 2020 to July 1, 2021 policy period, including the same or better policy terms, conditions and endorsements.

14.     The Insurer Defendants, however, contend that none of the 20-21 property policies provided open blanket property coverage, and coverage available for SMV's Fire-related property

---

[1]     A blanket property policy covers property damage and losses up to the approximately $36.6 aggregate property policy limit, regardless of the individual building limit amount listed on the Statement of Values submitted in relation to the property insurance policies.

damage and losses are limited to the individual listed building's limit as stated on the Statement of Values. While the Insurer Defendants have misrepresented the coverage available to SMV for its Fire-related losses and damages, the 20-21 Excess Property Policies subsequently provided to SMV do not reflect the same or materially better commercial property program coverages that AJG and Smith represented to SMV that they secured on its behalf.

15. To the extent that the 20-21 Excess Property Policies do not cover SMV's Fire-related property damage and losses, AJG and Smith must pay SMV for all Fire-related property damage and losses that the Insurer Defendants do not otherwise pay to it. AJG and Smith knew that SMV used the same badly outdated Statement of Values and that the individual building and structure values on that Statement were significantly below their individual market value and predicated on its open blanket property insurance program. If AJG and Smith knew that they could not secure a blanket property insurance program prior to when it asked SMV to bind the 20-21 Property Policies, they should have advised SMV to increase individual building and structure values that they knew were badly outdated to reflect SMV's significantly higher current appraisal value of the vineyard buildings and structures. They also should have included additional buildings and structures on SMV's Statement of Values.

16. AJG and Smith negligently failed to secure proper coverage for their client and misrepresented that the 20-21 Property Policies provided the same or materially better blanket commercial property coverages as those in force. AJG and Smith failed to (a) perform their respective work timely and professionally: and (b) advise SMV about how best to secure its requested and required property coverages. AJG and Smith knew that SMV relied on them for their professional insurance expertise to (i) secure the proper coverages or inform SMV of any proposed changes in coverage and how to best secure the required coverages in light of any such proposed changes; and (ii) review and ensure that all binders and policies issued to SMV were correct. To the

extent that the 20-21 Excess Policies do not cover all Fire-related property damage and losses, AJG and Smith failed to do their respective work professionally and properly.

17.     Consequently, AJG and Smith are liable for any of SMV's Fire-related property damage and losses that the Insurer Defendants do not cover in an amount to be determined at trial, but no less than an amount up to approximately $28 million.

## THE PARTIES

18.     SMV is, and at all relevant times to this action was, a Delaware corporation having a principal place of business in St. Helena, California.

19.     Landmark is, and at all relevant times to this action was, an Oklahoma corporation having a principal place of business in Atlanta, Georgia.

20.     Kinsale is, and at all relevant times to this action was, an Arkansas corporation having a principal place of business in Richmond, Virginia.

21.     Mt. Hawley is, and at all relevant times to this action was, an Illinois corporation having a principal place of business in Peoria, Illinois.

22.     Hallmark Specialty is, and at all relevant times to this action was, an Oklahoma corporation having a principal place of business in Dallas, Texas.

23.     Western World is, and at all relevant times to this action was, a New Hampshire corporation having a principal place of business in Franklin Lakes, New Jersey.

24.     AXIS is, and at all relevant times to this action was, an Illinois corporation having a principal place of business in Alpharetta, Georgia.

25.     AJG is, and at all relevant times to this action was, a Delaware corporation having a principal place of business in Illinois.

Complaint

26.     Dina Smith is, and at all relevant times to this action was, SMV's insurance account manager at AJG.  Ms. Smith resides and/or is domiciled in or around either Napa County or San Francisco County, California.

## JURISDICTION AND VENUE

27.     This Court has personal jurisdiction over the Insurer Defendants because they each issued and delivered their respective 20-21 Excess Policies to insure SMV's property, which is located within Napa County, in State of California.  The Insurer Defendants have purposefully availed themselves of the benefits and protections of the State of California by transacting business with SMV and have assumed continuing obligations to SMV in the State of California, as well as purposefully directing their activities to Napa County, California.

28.     This Court has personal jurisdiction over AJG because AJG transacted business with SMV and the Insurer Defendants and issued and delivered all 20-21 Excess Policies for SMV's property, which is located within Napa County, in State of California.  AJG has purposefully availed themselves of the benefits and protections of the State of California by transacting business with SMV and have assumed continuing obligations to SMV in the State of California, as well as purposefully directing their activities to Napa County, California.  AJG also is a necessary and indispensable party to this civil action.

29.     This Court has personal jurisdiction over Dina C. Smith because she is a resident or otherwise domiciled in or around either Napa County or San Francisco County, California.  Ms. Smith also is a necessary and indispensable party to this civil action.

30.     The Court has subject matter jurisdiction over the controversy pursuant to Cal. Const. Art. VI, § 10 and Cal. Civ. Proc. § 410.10, et seq.

31.     Venue is proper in this County pursuant to Cal. Civ. Proc. § 395(b) because the Defendants contracted to provide insurance (and in AJG's case insurance services) to SMV in

California and entered into all relevant contracts in California.  Venue also is proper (a) pursuant to Cal. Civ. Proc. §395(a) because Dina Smith is a resident or otherwise domiciled in California; and (b) in this County because (i) the property at issue is located in this County; and AJG and Smith negligently performed their respective services, in significant part, in this County; and (ii) pursuant to California Civ. Proc. §395.5, the Insurer Defendants' obligations under the 20-21 Excess Property Policies to pay covered losses were to be performed in Napa County and their liability arose in Napa County and/or they breached their respective policies in Napa County.

## RELEVANT FACTUAL BACKGROUND

### I.       Spring Mountain Vineyard

32.     SMV owns and operates an award-winning winery at the Miravalle Ranch ("Miravalle") and its three adjacent ranches—Chateau Chevalier Ranch ("Chevalier"), La Perla Ranch ("La Perla"), and Alba Ranch ("Alba")—in California's Napa Valley.  Aside from producing world-class wines, SMV's ranches are famous because the Miravalle Victorian house and the ranches provided the setting for the CBS television drama *Falcon Crest*, which aired from 1981 until 1990.

33.     SMV's property consists of 850 total acres, which includes a number of buildings, structures, and covered property as defined in the 20-21 primary property policy that are used, *inter alia*, in making, processing, and manufacturing SMV's wines.  The covered property includes trellises (used to support the vines from which SMV's wine is made) and irrigation systems used to water and nurture the grape vines.

### II.      SMV's Insurance Programs

34.     SMV annually purchases insurance policies for its vineyard operations, which include, among others, property/lost business income, liability, umbrella/excess, business automobile, equipment breakdown, inventory wine stock, earthquake/flood, and worker's compensation coverages.

35.     For many years (some 15-25) preceding the 20-21 policy period, SMV consistently maintained approximately $36.6 million in blanket coverage for property damage and losses for any covered property, including buildings and structures identified on the Statement of Values form submitted in conjunction with the property program policies.  Blanket property coverage ensured coverage for loss up to the aggregate policy limit, without reference to the specific covered property damaged or any individual building or structure values on SMV's Statement of Values

36.     AJG and its predecessor (collectively, "AJG") was SMV's insurance broker for the purpose of securing its insurance policies for the policy periods prior to July 1, 2020.  At all relevant times herein, Smith was SMV's account manager and supervisor at AJG.

37.     AJG and Smith provided SMV numerous insurance-related services, including  (a) placing, negotiating and underwriting coverages in accordance with SMV's directives, needs and expectations; (b) communicating with SMV about coverages available or not available; (c) advising SMV about possible alternatives designed to meet SMV's stated directives, needs and expectations so that any coverage decisions, if any, would be made well in advance of any policy purchase; (d) binding coverages that reflected SMV's final directives, needs and expectations, after discussing any coverage related issues; (d) ensuring that the policy binder reflects SMV's stated coverage directives, needs and expectations, and informing SMV about any potential discrepancies; (e) contacting insurers about any policy binder terms, conditions, exclusions, endorsements, or limitations that are incorrect to ensure that the policies accurately provide the necessary and bargained for coverages; (f) securing, renewing and analyzing policies to ensure that they reflect SMV's stated coverage directives, needs and expectations, and informing SMV and insurers about any discrepancies to ensure that the insurers correct them; and (g) assisting SMV in all aspects of the claim process to ensure that SMV maximizes any coverages available to pay for its losses and damages resulting from a claim.  At all relevant times herein, Smith managed and supervised AJG's above-referenced services.

38.   SMV relied entirely on AJG and Smith's expertise for their insurance needs, and to ensure that the proper coverage was obtained.

39.   For at least the 15-policy periods prior to the 2020-2021 policy period, AJG secured approximately $36.6 million in open blanket commercial and residential property policy coverage for SMV through Allianz-related entities, including Associated Indemnity Corporation and Firemen's Fund Insurance Company.  Since the Allianz-related entities renewed blanket property coverage, AJG treated the property policy renewal as automatic, without devoting significant time to that part of the insurance program.  AJG and Smith did not recommend to SMV to update the individual building/structures either on the Statement of Values or that Statement's individual value because all covered property (including those properties) was insured up to the aggregate limit, notwithstanding its location or the four separate ranches' individual limits.

40.   At all relevant times up to the July 1, 2020 renewal period, SMV had an excellent payment and loss history.  SMV paid its premiums and had no major losses.  This was another reason that SMV's annual policy renewals with Allianz involved little effort and apparently AJG and Smith anticipated the same for the 2020-21 policy period.

41.   SMV and AJG believed that the approximately $36.6 million open blanket coverage for property loss or damage to its property sufficiently insured any property damage or loss that any covered property might suffer, given the vineyard's topography and its loss mitigation program.

**III.    The 20-21 Property Program**

42.   In mid-March 2020, Allianz informed AJG it planned to exit the wine-related business and that it would not renew SMV's property programs.  AJG and Smith told SMV that they expected that remarketing SMV's coverage would be a relatively easy process, based upon SMV's history of timely premium payment and excellent loss and loss control history.  AJG and Smith informed SMV that wildfire property exposure could affect the premium price.

43.     SMV asked AJG and Smith to secure an open blanket property program for the 2020-21 policy period that was the same (if not better) in all material respects to its Allianz policies because, as AJG and Smith both knew, SMV had to keep that coverage in place to comply with its lender's loan covenants.  At SMV's direction, AJG and Smith submitted an application for approximately $36.6 million in open blanket commercial and residential property coverage that sought at least the same material terms, conditions, endorsements, limitations or exclusions as previously obtained from Allianz.

44.     At all relevant times herein, AJG and Smith knew that California law distinguished between "open" and "valued" policies and—with respect to covering the peril of fires or wildfires—precludes insurers from treating property policies as "stated value" policies.  AJG and Smith also knew that the California Insurance Code (*e.g.*, §§ 410-412, 2052-2053) defined a policy as either "open" or "closed," and that SMV requested it apply for and secure open blanket property coverage for SMV.

45.     During the 20-21 policy negotiation, underwriting and placement period (mid-March 2020 to June 30, 2020), AJG periodically requested that SMV provide it with specific discrete information that it needed either (i) to secure the requested property coverages; or (ii) to respond inquiries from the insurers or their agents.   SMV timely responded to each request and provided the requested information and/or documents.

46.     SMV called AJG and Smith weekly to check on progress securing coverages for the June 1, 2020 to July 1, 2021 policy period.  In late May 2020, AJG informed SMV that it asked Allianz to extend its 2019-20 Property Policies for an additional month while AJG finalized SMV's new property program.

47.     At no time before June 22, 2020 did AJG and Smith inform SMV of any issues that would prevent AJG from securing a new SMV property insurance program that was materially the

same as the 2019-20 property program.  In fact, AJG and Smith did not alert SMV to any problems that they might have in securing the exact same blanket property coverage until June 26, 2020.

48.     On June 11, 2020 (just 19 days before the new policies needed to be in effect), AJG told SMV that the underwriters had requested updates on SMV's Statement of Values for (a) the buildings' conditions; (b) swimming pools; (c) type and age of roof; (d) electrical-years updated and confirmation of circuit breakers; (e) plumbing-years updated and confirm water heaters strapped for residences; (f) HVAC-age and confirm regularly maintained; (g) fire hydrant distances; and (h) eq-retrofit.

49.     SMV provided AJG with the information requested.  AJG and Smith did not ask for additional information to secure property coverage consistent with SMV's application, needs and directives.  As such, SMV continued to believe that AJG's efforts to remarket its property coverage were proceeding smoothly and had no reason to believe that its coverages would be materially different from past years.

50.     On June 22, AJG and Smith first informed SMV that AJG was still awaiting premium quotes but that the insurers were slow to respond, and there were concerns related to wildfires and building updates.  AJG and Smith also informed SMV, for the first time, that 6 insurers had declined to provide SMV with property and equipment coverage.  AJG and Smith did not tell SMV that AJG was unable to secure open blanket property coverage comparable to that in force or suggest to SMV that it might need to alter its property coverage application in any way to secure the desired coverages.

51.     On Friday June 26, 2020, AJG and Smith first informed SMV that no property carrier had agreed to provide the desired coverage, and that AJG was exploring a layered approach involving 9 insurers.  AJG and Smith told SMV that it had four (4) insurers that would provide the first $10 million with Swiss Re (First Specialty) as the lead, but it did not (a) disclose to SMV how or if this

layered approach might impact its property coverages or pricing; or (b) suggest that SMV consider alternative coverage strategies that AJG and Smith could pursue on its behalf to secure the coverages required.

52.     AJG and Smith also informed SMV that the property policies would not include certain residential properties in the 20-21 property coverage.  They informed SMV, however, that AJG expected to separately secure such residential property coverage.

53.     AJG and Smith did not tell SMV that they could not secure the same (if not better) open blanket commercial property coverages in all other material respects as those in force with Allianz through 11:59 pm PT on June 30, 2021.  AJG and Smith also did not suggest that SMV explore alternative ways to expand its 20-21 property coverage or alter its property application in any way to address issues that had arisen during AJG's dealing with First Specialty, any of the Insurer Defendants, or their designated agent underwriters.

54.     On Monday June 29 at 11:32 pm CT, AJG and Smith notified SMV that it obtained $35,565,435 in property and business income coverage and that AJG had 8 of the 9 different insurers in place for a $662,168.08 premium payment.  They also notified SMV that AJG and Smith (a) believed that AJG would secure the additional half layer for an additional $32,000 premium; and (b) was also finalizing residential quotes for SMV.  The proposed premium was almost 7-times greater than the 2019-20 Allianz property premium of $111,048 for both commercial and residential property coverage.

55.     AJG and Smith always informed and led SMV to believe that they had, in fact, secured approximately $35.6 in open blanket commercial property coverage based on SMV's Statement of Values' aggregate total.

56.     Thus, as of June 30, the sole coverage changes that AJG, and Smith disclosed to SMV were that the 20-21 Property Policies would (i) have a $35,565,435 aggregate policy limit for SMV's

Covered (commercial) Property because the coverage would not include residential property; (ii) have a higher wildfire deductible; (iii) be layered among 9-different insurers; and (iv) have a significantly higher premium.

57.     In the morning of June 30 (the day coverage had to be bound), SMV expressed shock at the proposed significantly higher property premium.  AJG and Smith told SMV that it could reduce the premium by $95,000 and keep all locations in its property program if it reduced the total aggregate loss limit for the property program policies to $20 million instead of maintaining the $35,565,435 Statement of Value aggregate policy limit.  Given that its lender required SMV to keep the same coverages in effect, SMV told AJG and Smith that it opted to pay the higher premium to maintain the same (if not better) open blanket commercial property coverage in all other material respects as it currently had in force with Allianz.

58.     In a conference call on June 30, SMV asked AJG and Smith to confirm that it had secured $35,565,435 in open blanket commercial property coverage before it authorized AJG and Smith to bind the 20-21 property coverage on its behalf.  Smith confirmed that they had secured that coverage.  She assured SMV that the commercial property coverage was the same if not better in all other material respects as the coverage in force.

59.     Relying upon those representations, SMV authorized AJG and Smith to bind coverage for the 20-21 property policies, and SMV subsequently signed its Statement of Values on July 2, 2020.  Had SMV known that AJG and Smith had not, in fact, acquired the property coverage that it authorized them to bind, SMV would not have allowed AJG and Smith to bind the 20-21 property policy coverages.

60.     On July 15, 2020, AJG emailed the purported policy binders to SMV.  As broker of record and its account manager, AJG and Smith were obligated to review the policy binders, inform SMV if they contained any mistakes and contact the insurers to correct any such mistakes.  At all

relevant times, SMV relied on AJG and Smith to perform this critical evaluation given that it did not have any in-house insurance coverage expertise.

61.     In its July 15 transmittal email, AJG did not discuss details about the 20-21 property policy's terms, conditions, exclusions, endorsements, or limitations.  Nor did AJG or Smith tell SMV that they had not reviewed the policy binders to confirm that the property coverage bound accurately reflected the open blanket property coverage that SMV authorized AJG and Smith to secure on its behalf.

62.     SMV reasonably assumed that AJG and Smith performed their jobs, reviewed the binders, and found that the policy binders reflected that SMV had received, at minimum, the open blanket property coverages that it authorized AJG and Smith to secure on its behalf.

63.     On information and belief, AJG and Smith did not review the policy binders.  Had they done so, they would have seen that the binders did not provide open blanket property coverage and that policy terms, conditions, endorsements, exclusions, and limitations were not, at minimum, materially the same as those found in its now expired 2019-20 Allianz property policies.  Had they conducted such a review, AJG and Smith also would have been required to (a) inform SMV that the binders did not reflect the property coverages that SMV authorized them to secure; and (b) contact the insurers to correct all coverages.  AJG did not do either.

IV.     **The Glass Fire Damaged SMV's Covered Property**

64.     On September 27, 2020, a large wildfire (later dubbed the "Glass Fire") swept through Napa Valley, ultimately damaging large swaths of SMV's covered property.

65.     The Glass Fire caused catastrophic fire and smoke damage to (i) the La Perla Historic Winery building, its Red Barn, and 3-farmhouses; (ii) the Chevalier Red Barn and the Chevalier Historic Winery building; (iii) the Alba Winery buildings; (iv) several Miravalle buildings; and (v)

virtually all of SMV's trellises and irrigation systems that serviced the winery buildings and all of SMV's wine processing and making operations.

66.     SMV still has not discovered all of the damage the Glass Fire caused to its property; SMV's current, best estimate puts the total at more than $38,500,000.

**V.      The Property Insurers' Claim Investigation
         and 20-21 Property Policies' Coverage**

67.     In early October 2020, SMV hired the Greenspan Company/Adjusters International ("Greenspan") to (a) quantify its losses; (b) interface with the property insurers' adjustor McLarens; (c) secure required advance payments; and (iv) maximize its blanket property coverage to pay for SMV's losses to its covered property.

68.     As of early October 2020, AJG still had not provided SMV with its 20-21 property policy coverages.  At Greenspan's request, SMV asked AJG and Smith to provide the 20-21 property policies for review.

69.     On or about October 2, AJG emailed SMV that the property insurers had sent some of 20-21 Property Policies.  AJG emailed those policies to SMV and its representatives but indicated that AJG and Smith had not yet conducted its final check process to ensure that the policies received accurately reflected SMV's requested coverage.  On or about October 9, AJG delivered the remaining 20-21 property policies to SMV and its representatives.

70.     On an October 13, 2020, conference call, SMV and AJG discussed the coverage in effect under the 20-21 Property Policies for the Fire-related damage.  During that call, Smith: (i) said that SMV had open blanket property coverage that conformed in all material respects to its earlier policies; (ii) acknowledged that on June 30, 2020, she told SMV's Mary Seavoy that she had secured open blanket property coverage for SMV and that that property coverages conformed in all material respects and was, at least, as broad as to the expiring Allianz property coverages; and (iii) said that

---

17
Complaint

she still had to conduct her final policy check process to ensure that the 20-21 Property Policies accurately reflected the property coverages that AJG and she secured for SMV.

### A. The Initial Claims and Coverage Investigation

71.     On October 14, Greenspan and McLarens met at SMV's property to begin to assess the property damage and losses that SMV sustained due to the Glass Fire and to discuss advance actual cash value payments.  At a subsequent site visit in or around late October 2020, both SMV's and the property insurers' representatives acknowledged that the vineyard's total damages likely exceeded $30 million.  McLarens also told SMV's representatives that the 20-21 Property Insurers would advance payments for the structures listed/detailed on SMV's Statement of Values but not for other buildings or structures.

72.     In response, SMV and its representatives began to review the 20-21 Property Policies. SMV requested that AJG and Smith expedite its internal policy review.

73.     SMV subsequently learned that the 20-21 Property Policies had certain material terms, conditions, endorsements, and limitations that were inconsistent with the open blanket property coverages that AJG said it had obtained.  SMV asked Smith to contact the 20-21 Property Insurers and their underwriters to correct their insurance binders and 20-21 Property Policies to reflect the open blanket coverage and the policy terms, conditions, endorsements, exclusions, and limitations that, according to AJG and Smith, the 20-21 Property Insurers agreed to provide.

74.     Shockingly, AJG and Smith refused to convey its client's request to the 20-21 Property Insurers.  To SMV's knowledge, AJG and Smith also never conducted its final policy check to confirm that the 20-21 Property Policies accurately reflected the open blanket coverage and policy terms, conditions, endorsements, exclusions, and limitations that AJG and Smith requested SMV authorize them to bind.

75.     Moreover, notwithstanding its above-referenced representations to SMV, Smith subsequently emailed SMV and its representatives that "we confirm that no insurer agreed to provide blanket coverage and a quote would not have been provided had blanket limit limits been required." Additionally, since AJG and Smith determined that they could not obtain open blanket coverage that they previously represented that they secured, AJG and Smith apparently decided that they no longer had to review the accuracy of the 20-21 Property Policies and push for corrections.

76.     AJG and Smith never discharged their duties to review the 20-21 Property Policies and request that the 20-21 Property Insurers correct any inaccurate terms, conditions, endorsements, exclusions, or limitations contained therein.

**B. The 20-21 Property Policies in SMV's Possession**

77.     The 20-21 Property Insurers, along with several additional insurers not named in this action, issued "all risks" commercial property policies for SMV for the policy period of July 1, 2020-July 1, 2021.

78.     First Specialty issued and delivered a $5 million primary property policy to SMV for covered property damage or loss subject to all terms, conditions, endorsements, exclusions, and limitations that are not at odds with California public policy, statutes, regulations, or law. The First Specialty policy had a $500,000 deductible for wildfires. The 20-21 primary property policy provides, in relevant part, that:

- [The Insurer] will pay for direct physical loss of or damages to Covered Property at the premises described in the Declaration caused by or resulting from any Covered Causes of Loss.

- Covered Property…means **Buildings**, meaning the building or structure described in the Declarations, including (1) completed additions; (2) Fixtures, including outdoor fixtures; (3) Permanently installed: (a) Machinery; and (b) Equipment. The Declaration Item 2 "PREMISES DESCRIBED" refers to the "schedule on file received by us on: 06/25/2020."

- Covered Property also includes **Business Personal Property**, which consists of the following property located in or on the building or structure described in

the Declarations or in the open within 100 feet of the building or structure or within 100 feet of the premises described in the Declaration, whichever distance is greater: (1) furniture or fixtures; (2) Machinery or equipment; [and] (3) "Stock."

- The premises described in the Declarations are SMV and its four (4) ranches.

- When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy. The Declarations show "Special" and the Policy covers direct physical loss caused by a WILDFIRE.

- A "WILDFIRE" is a partially or wholly uncontrolled wildland or wilderness fire, human or naturally caused. Wildfire . . . shall include escaped prescribed fires, brush fires, bushfires, desert fires, forest fires, grass fires, hill fires, peat fires, vegetation fires, veld fires, and any embers arising from such fire, when such embers result in covered fire or loss damage, and any smoke, soot, or ash remediation expenses as insured by this POLICY, to INSURED PROPERTY at INSURED LOCATION(S)."

- Replacement Costs (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form. The Declaration states that SMV is entitled to Replacement Costs, which is separately endorsed for Roofs, Roofing Systems or Roof Coverings.[2]

- In the event of loss hereunder, the total Program Limit of Liability . . . shall be limited to the least of the following: a. The actual adjusted amount of loss, less applicable deductible(s), b. The total stated value for the property involved, as shown on the latest Statement of Values on file with us, less applicable deductible(s), c. The limit of Liability or Limit of Insurance shown on the face of this Policy or endorsed onto this Policy.

- Loss or damages for, among others, tree, shrub or plant removal and debris removal are covered.

79. SMV's property damaged by the Glass Fire is either INSURED Property at the INSURED LOCATION(S) or Covered Property and not subject to any exclusions or limitations in the 20-21 First Specialty primary property policy.

80. Landmark and Kinsale issued and delivered a $5 million 20-21 first layer of excess property coverage to SMV for covered property damage or loss between $5 million and $10 million

---

[2] SMV can elect Actual Cash Value but still be entitled to Replacement Costs.

subject to the policy's terms, conditions, endorsements, exclusions, and limitations that are not at odds with California public policy, statutes, regulations or law.  The combined coverage is $5 million above First Specialty's $5 million and is split equally between Landmark and Kinsale, such that each is responsible for $2.5 million of the $5 million combined limit.

81.     The Landmark/Kinsale 20-21 first layer excess policies separately provide, in relevant part, that:

- In respect of the perils hereby insured against, this Policy follows the form and is subject to the same warranties, terms and conditions (except as regards the premium, the amount and limits of liability other than the deductible or self-insurance provision where applicable and the renewal agreement, if any; and EXCEPT AS OTHERWISE PROVIDED HEREIN) as are contained in …the First Specialty primary policy.

- (Per endorsement): In the event of loss hereunder, liability of the Company shall be limited to the least of the following liability limitation measures in any one "occurrence": a. The actual adjusted amount of the loss, less applicable deductibles and primary and underlying excess limits; or b. 100% of the individually stated value for each scheduled item of coverage insured at the location which had the loss as shown on the latest Statement of Values on file with this Company, less applicable deductibles and primary and underlying excess limits; or c. The Limit of Liability as shown on the Declarations page of this policy or as endorsed to this policy, if, after the application of the limits in a. or b. above to each scheduled item of coverage which had the loss, the total exceeds such Limit of Liability.

82.     SMV's property damaged by the Glass Fire is Covered Property and not subject to any exclusions or limitations in the Landmark/Kinsale 20-21 first layer excess property policies.

83.     Mt. Hawley issued and delivered a $10 million 20-21 second layer of excess property policy to SMV for covered property damage or loss between $10 million and $20 million subject to the policy's terms, conditions, endorsements, exclusions, and limitations that are not at odds with California public policy, statutes, regulations or law.

84.     Mt. Hawley's second layer excess property policy provided, in relevant part, that:

- In consideration of the payment of the premium stated in the declarations and subject to the terms and conditions contained in our policy or endorsed hereon, we agree to insure against risks of direct physical loss or damage to covered

21
Complaint

property per the terms and conditions of the First Specialty policy, except as excluded herein.

- Our policy insures against loss or damage as per the terms and conditions of the First Specialty policy, except that where our provisions and stipulations are more restrictive or contrary to those of the First Specialty policy, our policy will supersede.

- In no event shall the "Ultimate Net Loss" exceed the less[er] [sic] of the following: A. Actual adjusted amount of loss; B. Total stated value for the property lost or damaged, as shown on the latest statement of values on file with us; C. Your financial interest.

- Ultimate Net Loss means the actual loss or damage sustained by you (including any Deductible or self-insured retention amount) as a direct result of perils insured against and the coverages provided in our policy for Covered Property hereunder arising from one loss or disaster, after making Deductions for salvage, subrogation and recoveries from any source other than our policy and the underlying and excess insurance policies.

85.     SMV's property damaged by the Glass Fire is Covered Property and not subject to any exclusions or limitations in the Mt. Hawley 20-21 second layer excess property policies.

86.     Hallmark Specialty and Western World issued and delivered a $10 million 20-21 third layer of excess property coverage to SMV for covered property damage or loss between $20 million and $30 million subject to the policy's terms, conditions, endorsements, exclusions, and limitations that are not at odds with California public policy, statutes, regulations or law.  The combined coverage is $10 million above first $20 million in property coverage and is split equally between Hallmark Specialty and Western World, such that each is responsible for $5 million of the $10 million combined limit.

87.     The Hallmark/Western World 20-21 third layer excess policies provide, in relevant part, that:

- Subject to the limitations, terms, and conditions contained in this Policy or any endorsement attached hereto, Hallmark Specialty and Western World agree to indemnify the Insured for direct physical loss or damage to the covered property at covered locations, occurring during the Policy Period, and caused by covered perils, all as defined in the First Specialty policy.

- Except as regards the premium, the amounts and Limit of Liability other than deductible or self-insured retentions where applicable, and the renewal agreement, if any, AND EXCEPT AS OTHERWISE PROVIDED HEREIN, this Policy is subject to the same limitations, terms, and conditions contained in the First Specialty policy and, to the extent that coverage is further limited or restricted thereby to those contained in any Underlying Insurance.

- (Per a Hallmark Specialty endorsement): In the event of loss here under, liability of the Company shall be limited to the least of the following liability limitation measures in any one "occurrence": a. The actual adjusted amount of the loss, less applicable deductibles and primary and underlying excess limits; b. the individually stated value for each scheduled unit of insurance for Building, Personal Property, Time Element or other coverage at the location which had loss shown on the latest Statement of Values on file with the Company, less applicable deductibles and primary and underlying excess limits. If no value is shown for a scheduled item then there is no coverage for that item; or c. The Limit of Liability as shown on the Declarations page of this policy or as endorsed to this policy.

- (Per a Western World endorsement): In the event of loss or damage, liability of the Company shall be limited to the lesser of the following: (1) the actual value of the loss or damage after loss adjustment, less all applicable underlying Insurance Policies, deductibles, and self-insured retentions; (2) the stated value for the lost or damaged property, as shown on the latest statement of values on file with the Company prior to the date of loss or damage, less all applicable Underlying Insurance Policies, deductibles and self-insured retentions; or (3) the applicable Limit of Insurance shown in the Declaration.

88.     SMV's property damaged by the Glass Fire is Covered Property and not subject to any exclusions or limitations in the Hallmark Specialty/Western World 20-21 combined third layer excess property policies.

89.     AXIS issued and delivered the final $5,565,435 20-21 fourth layer of excess property policy to SMV for covered property damage or loss between $30 million and $35,565,435 subject to the policy's terms, conditions, endorsements, exclusions, and limitations that are not at odds with California public policy, statutes, regulations or law.

90.     The AXIS fourth layer excess policy provided, in relevant part, that:

- Subject to the limitations, terms, and conditions contained in this Policy or any endorsement attached hereto, AXIS agree to indemnify the Insured for direct physical loss or damage to the covered property at covered locations, occurring during the Policy Period, and caused by covered perils, all as defined in the First Specialty policy.

- Except as regards the premium, the amounts and Limit of Liability other than deductible or self-insured retentions where applicable, and the renewal agreement, if any, AND EXCEPT AS OTHERWISE PROVIDED HEREIN, this Policy is subject to the same limitations, terms, and conditions contained in the First Specialty policy and, to the extent that coverage is further limited or restricted thereby to those contained in any Underlying Insurance.

- The Company shall not be liable for more than the Total Limit of Liability for this Policy as shown on Item 1 of the Schedule in any one Occurrence regardless of the number of Locations or coverages involved.

91.     SMV's property damaged by the Glass Fire is Covered Property and not subject to any exclusions or limitations in the AXIS 20-21 fourth layer excess property policies.

**C. The 20-21 Insurer Defendants' Bad Faith Claims Handling**

92.     During a site visit and investigation in or around late October 2020, McLarens acknowledged that actual cash value of SMV's Fire-related loss and property damage to Covered Property was at least between $20-$25 million, and that the vineyard likely suffered property damage and loss from the Fire that exceeded $30 million.

93.     Thereafter, First Specialty agreed to make an initial $1 million advance payment.  On October 29, 2020, SMV submitted its first Sworn Statement in Partial Proof of Loss.

94.     First Specialty subsequently agreed that SMV's Fire loss and damage was fully covered under the 20-21 primary property policy and agreed to pay its full $5 million policy limit.  It requested and received two more Sworn Statements in Partial Proof of Loss from SMV and paid its full $5 million policy limit.

95.     As a result, the 20-21 first layer excess Landmark/Kinsale polices were triggered. However, notwithstanding their knowledge of actual cash value of SMV's Fire-related Covered Property loss and damages, Landmark and Kinsale did not make any advanced payments to SMV to cover the actual cash value of undisputed amounts.

96.     Therefore, in early 2021, SMV asked the Insurer Defendants to provide their coverage positions.  SMV reiterated its requests several times during the next few months and SMV's adjustor also repeatedly asked McLarens to obtain the Insurer Defendants' coverage positions.  Greenspan also repeatedly asked McLarens to have the Insurer Defendants respond to SMV's position concerning the scope of First Specialty's broad Covered Property definition in relation to SMV's Fire-related claims.

97.     The Insurer Defendants' withholding of actual cash value advance payments breached their respective duties to promptly pay undisputed amounts as required by the implied covenant of good faith and fair dealing attaching to each policy.

98.     The Insurer Defendants' refusal to pay the 20-21 Excess Property Policies' remaining $30,565,435 in insurance proceeds was inherently unreasonable and in conscious disregard of established California law.

99.     First, California law distinguishes between "open" policies and "valued" policies and – with respect to policies covering the peril of fire (like the Insurers' Policies) – precludes the Insurers from treating the Policies as "stated value" policies.

100.    Cal. Ins. Code § 410 states: "[a] policy is either open or valued."

101.    Cal. Ins. Code § 411 defines an "open policy" as "one in which the value of the subject matter is not agreed upon but is left to be ascertained in case of loss."

102.    Cal. Ins. Code § 412 defines a "valued policy" as "one which expresses on its face an agreement that the thing insured shall be valued at a specified sum."

103.    To create a "valued" policy, California law requires that the "building or structure to be examined by the insurer and the value of the insured's interest therein shall be fixed at the time by the parties." Cal. Ins. Code § 2052. California law also requires that "[a] clause shall be inserted in

25
Complaint

such a valued policy, stating substantially that the value of the insured's interest in the insured building or structure has been thus fixed." Cal. Ins. Code § 2053.

104.    The Insurer Defendants did not satisfy either of these requirements.  The 20-21 Property Insurers and their agents did not examine SMV's buildings, structures and covered property and personal property prior to issuing the 20-21 Property Policies and did not fix the value of SMV's interest in any of that property or set a specific sum.

105.    On information and belief, the 20-21 Property Insurers knew that buildings, structures, and personal property listed on SMV's Statement of Values were outdated and did not reflect their significantly higher current market value.  The Insurer Defendants' failure to request new values constituted a violation of both their respective duties of good faith and fair dealing and California insurance regulations.

106.    The 20-21 Property Policies also do not include any clause directly located in any the Policies that the value of any of SMV's building, structure, covered property or covered personal property had been fixed at a specific sum.  Nonetheless, the Insurer Defendants continue to treat the 20-21 Excess Property Policies as specific sum policies by applying limits commensurate with SMV's Statement of Values without complying with California's "valued" policy requirements established by the Insurance Code.  In so doing, the Insurer Defendants are violating California law.

107.    On or about March 22, 2021, the Insurer Defendants' adjustor forwarded to SMV's insurance adjustor a proposed SMV Proof of Loss for another $2,508,855.85 advance payment without performing a full, fair, and thorough investigation of SMV's Fire-related claims as required by California's implied covenant of good faith and fair dealing.  McLarens informed SMV's representative that, notwithstanding SMV's repeated requests for their coverage positions, the Insurer Defendants continued to investigate SMV's Fire-related claim pursuant to their respective reservation

of rights letters.  In fact, Landmark sent a March 24, 2021, reservation of rights letter to SMV, which noted that it continued to investigate the loss and would not yet issue a coverage position.

108.    The Insurer Defendants did not ask SMV to submit a formal proof of loss to confirm that its total Fire-related insurance claim exceeded the $20-$25 million that the adjustors (both SMV's and the Insurer Defendants') previously agreed was a fair and reasonable estimate of the actual cash value of SMV's Fire-related loss and damages to Covered Property.

109.    On July 13, 2021, SMV emailed the Insurer Defendants' adjustor and submitted a Sworn Statement in Partial Proof of Loss subject to its reservation of all rights.   In its email, SMV noted that it currently sought an additional $27,849,027.80 and requested that the Insurer Defendants pay their respective shares of SMV's loss within 30-days.  The email also noted that, despite SMV's repeated requests, the Insurer Defendants still had not submitted a formal coverage response almost 9-months after this claim was made.  SMV also requested that the Insurer Defendants or McLarens provide SMV with (a) any questions or comments about SMV's Proof and Statement of Loss with 14-days; and (b) the Insurer Defendants' coverage positions.

110.    On August 5, 2021, Mt. Hawley sent a reservation of rights letter to SMV.  Mt. Hawley indicated that its coverage investigation was ongoing and asked SMV to respond to its voluminous document requests and submit to examinations under oath conducted by its attorneys. Mt. Hawley acknowledged that it was investigating this matter with the assistance of its representative adjustor McLarens but erroneously claimed that SMV's Sworn Statement in Partial Proof of Loss was its first indication that SMV's Fire-related claims might implicate its excess coverage layer.   As noted above, Mt. Hawley's agent previously acknowledged that SMV's Fire-related losses exceeded $30 million, and McLarens did a preliminary analysis that showed that certain SMV losses and damages to Covered Property totaled at least $15 million.

111.    On or about August 10, 2021, McLarens asked SMV to clarify its July 13 Sworn Statement in Partial of Loss calculations and address additional issues.  By letter of August 23, 2021, SMV stated that it would revise its July 13 Sworn Statement in Partial Proof of Loss and answered McLarens' questions.  SMV submitted its Revised Sworn Statement of Partial Proof of Loss subject to its reservation of all of its rights on August 26, 2021.

112.    McLarens also continued to investigate SMV's Fire-related claims on the Insurer Defendants' behalf on September 1 again visited SMV to inspect its loss and property damage.

113.    On September 22, McLarens sent another proposed Proof of Loss to SMV for an additional advance payment and attached its updated Statement of Loss.

114.    On September 27, 2021, SMV submitted its Sworn Statement in Partial Proof of Loss subject to its full reservation of rights.   In its email, SMV noted that (a) none of the Insurer Defendants have issued a coverage opinion and analysis despite SMV's repeated requests; (b) their failure to timely provide such letters, opinions and analyses greatly prejudiced SMV and the Insurer Defendants have breached their respective obligations of good faith and fair dealing owed to their insured; (c) absent SMV's review and analysis of such coverage letters, opinions or analyses, SMV will not accept any statement of loss or statements of value that characterizes a payment as anything besides either (i) a partial payment against the remaining balance owed on SMV's August 26 Sworn Statement of Partial and Statement Proof of Loss; or (ii) an advance payment; and (d) all previous proofs of loss, in fact, were submitted and paid on an advanced payment basis for actual cash value losses.

115.    SMV also stated that (a) it informed its 20-21 Property Insurers and McLarens that they promised to, did and were obligated to provide coverage on an open blanket coverage basis; (b) at the time of either the payment of the initial premium or promise to pay the initial premium on or about June 30, 2020, SMV was informed that the 20-21 Property Insurers had bound coverage and

would issue policies on an open blanket coverage basis for any and all property loss at the property

unless any such loss was specifically excluded; and (c) any deviation from this promise would,

among other things, constitute a breach of their contractual obligation, bad faith, and

misrepresentations.

116.    McLarens responded by letter dated September 29, 2021 stating that its response was

submitted for the Insurer Defendants except for Mt. Hawley.  McLarens stated that the parties had so-

called "Resolved Items" for which First Specialty, Landmark and Kinsale had paid $7,508,855.85 but

agreed to pay a small additional amount to bring the total alleged market payments to $7,659,534.86.

At the same time, McLarens stated that the Insurer Defendants (except Mt. Hawley) disputed their

obligation to pay any of the remaining $25,308,287.32 for SMV's Fire-related claims.

117.    The September 29, 2021 letter was the first (and only) coverage declination sent to

SMV for its Fire-related claims.  Landmark, Kinsale, Hallmark Specialty, Western World and AXIS

stated that (a) the 20-21 Property Policies limited the 20-21 Property Insurers' liability to a total of

$4.8 million for the La Perla Historic Winery and $525,000 for the Alba Winery buildings #1-2; and

(b) they declined to pay any additional amounts claimed for these buildings or any Covered (La Perla

and Alba) Property on SMV's Statement and Proof of Loss.  Their letter also accepted that First

Specialty's Covered Property definition covered more than the buildings and structures on SMV's

Statement of Values, but also stated that SMV's trellises and irrigation systems did not fall within that

policy's Covered Property definition.  Therefore, Landmark, Kinsale, Hallmark Specialty, Western

World and AXIS also denied coverage for SMV's trellises and irrigation damages.

118.    On October 29, 2021, SMV responded, in part, to McLarens' September 29 letter,

noting that it would update and revise its Statement and Proof of Loss (the "Second Revised Proof of

Loss") to include, among others, the Chevalier Red Barn, as well as other properties.  It noted that

those excess property insurer defendants' Covered Property interpretation showed that they should

have covered several other damaged buildings and structures.  SMV also disputed the excess property insurer defendants' Miravalle Shop damages calculation and its coverage declination for SMV's trellises and irrigation systems.  SMV requested that the 20-21 Insurer Defendants pay open claims and reserved its rights.  Finally, SMV questioned their reliance on the policy's purported liability limit language and indicated that it continued to investigate the 20-21 Property Policies' intended coverage, including whether the 20-21 Property Policies had open blanket property coverage.

119.    On November 2, 2021, SMV submitted its Second Revised Sworn Proof of Loss and its Revised Statement of Loss, in which it claimed that the Insurer Defendants owed their respective excess policy limits to pay their shares of the full $35,565,435 aggregate 20-21 Property Policies' limit.  Exhibit 1 is a copy of SMV's Second Revised Sworn Statement of Proof of Loss and its Revised Statement of Loss

120.    Pursuant to its August 5 and subsequent requests, SMV also produced documents and submitted to four (4) examinations under oath requested by Mt. Hawley.   During the examinations, it became clear that Mt. Hawley always intended to deny coverage on the same grounds raised by the other excess property insurer defendants and that Mt. Hawley was conducting its purported coverage investigation in bad faith.

121.    SMV also sent a demand letter to all of the Insurer Defendants requesting (i) $2,340,465.14 from Landmark/Kinsale (which represents the amount still due pursuant to their $5 million combined first layer excess property policy's limit); (ii) Mt. Hawley's full $10 million policy limit for its 2020-21 second layer excess property policy; and (iii) at least $9,153,414.20 of Hallmark Specialty/Western World's 2020-21 $10 million combined third layer excess property policy.  SMV also informed the Insurer Defendants that it continued to investigate whether the 20-21 Property Insurers agreed to provide open blanket property coverage and whether the 20-21 Property Policies had to be revised or reformed to reflect that promised coverage.  SMV also informed the Insurer

Defendants that: (i) the 20-21 Excess Property Policies did not limit liability to a total of $4.8 million for the La Perla Historic Winery and $525,000 for the Alba Winery buildings #1-2; (ii) First Specialty's Covered Property definition required the Insurer Defendants to pay SMV for the property damage and loss sustained at additional properties, including the Chevalier Red Barn, the La Perla Red Barn, and SMV's trellises and irrigation systems; and (iii) they should pay SMV additional monies for the damages sustained at Miravalle Shop.

122.    The Insurer Defendants (except for Mt. Hawley) acknowledged receipt of SMV's demand letter and indicated that they continued to investigate (i) the loss; and (ii) analyze the materials provided to date and SMV's coverage position.  They stated that they would respond to SMV's demand letter when their investigation and analysis are complete.  Mt. Hawley continued to claim that its coverage investigation is ongoing and that it will not render a final coverage determination until its investigation is complete.

### FIRST CAUSE OF ACTION
### DECLARATORY JUDGMENT
### (Against the Insurer Defendants)

123.    SMV incorporates by reference the preceding paragraphs as if fully set forth herein.

124.    SMV entered into legally binding written contracts with First Specialty and each of the Insurer Defendants.  SMV is the named "Insured" under each 20-21 Property Policy, including the 20-21 Excess Property Policies.

125.    SMV provided timely notice of its Fire-related insurance claims the 20-21 Property Insurers, including the Insurer Defendants.  SMV notified them that it made claims for all insurance benefits, losses, costs, and expenses arising from the Fire.

126.    SMV has complied in all material respects with the conditions and requirements of the 20-21 Property Policies and/or (a) such conditions and requirements have been waived; or (b) their satisfaction is otherwise excused by either operation of California public policy, statutes, regulations,

or law, or the Insurer Defendants' conduct.  The Insurer Defendants are estopped from asserting all contractual provisions, if any, that (i) purport to limit or otherwise negate their obligations to provide insurance benefits, losses, costs, and expenses under the 20-21 Excess Property Policies and California law; (ii) purport to limit in any coverage terms, conditions or obligations not otherwise disclosed to SMV by the 20-21 Property Insurers before the July 1, 2020 policy period commenced; and/or (iii) are at odds with California public policy, statutes, regulations or law that protect, among others, California policyholders and/or California properties.

127.     SMV's Fire-related claims are covered under the 20-21 Property Policies and not excluded, including under each of the respective 20-21 Excess Property Policies.  The 20-21 Property Policies also do not exclude or limit coverage for the damaged completed additions, fixtures including outdoors fixtures or permanently installed machinery and equipment including the trellises and irrigation systems.  As such, all of this property is covered because the damages arose from a covered peril and was not otherwise excluded or limited.

128.     The Insurer Defendants do not dispute that SMV's Fire-related La Perla Historic Winery building and Alba Winery building #1-2 claims triggered the 20-21 Property Policies Coverage or that First Specialty, Landmark and Kinsale had a duty to pay SMV for its insurance benefits, losses, costs, and expenses for these claims.  The Insurer Defendants do not dispute that the 20-21 Property Policies were triggered by certain of SMV's Fire-related claims and that First Specialty, Landmark and Kinsale had a duty collectively to pay SMV $7,659,534.86 for its insurance benefits, losses, costs, and expenses related to (a) the La Perla Historic Winery (First Specialty alone); (b) Alba Winery buildings #1-2; (c) Miravalle Shop damage; (d) the building cleaning at the Miravalle Winery Office, Victorian House, Cottage, Shop, Barn,  Greenhouse, Cave and the Chevalier Historic Winery building; (e) the personal property cleaning at Miravalle Winery Office, Victorian House, Cottage, Shop, Barn and the Miravalle Cave and its Barrels and Inventory; (f)

painting of the Miravalle Winery Office, Victorian House, Cottage, and Barn; (g) $100,000 for the La Perla House; and (h) $10,000 for certain outdoor property.

129.    Rather, the Insurer Defendants dispute their obligation to pay SMV: (a) $19,316,701.76 for the covered La Perla Winery building damage; and (b) $741,474.47 for the covered Alba Winery buildings #1-2.  The Insurer Defendants state that liability for (i) the La Perla Historic Winery is limited to $4.8 million that First Specialty paid to SMV under its 20-21 property policy; and (ii) the Alba Winery buildings #1-2 is limited to a $525,000 that First Specialty and/or Landmark and Kinsale paid to SMV.

130.    The Insurer Defendants' failure to pay constitutes a breach of contract.

131.    As a result, Mt. Hawley's 20-21 second layer excess property policy coverage also is triggered.

132.    Pursuant to the limitations of liability endorsement in the Mt. Hawley 20-21 excess policy, Mt. Hawley must pay $4.8 million to cover the La Perla Winery's damages.  Its limitation of liability provision would, if applicable, only limit any of its La Perla Winery Covered Property obligation to a total $4.8 million payment under its 20-21 second layer excess property policy.

133.    Pursuant to their respective limitation of liability provisions, all of the estimated $741,474.47 in Fire-related damages to the Alba Winery buildings #1-2 is covered as follows: either (a) First Specialty $200,000, Landmark/Kinsale $200,000 ($100,000 each), and Mt. Hawley at least $341,474.47; or (b) in a manner under the Insurer Defendants' 20-21 Excess Property Policies that maximizes coverage for all of SMV's Fire-related claims.

134.    The Insurer Defendants' interpretation of their respective limit of liability provisions also constitutes a breach of their respective obligations pursuant to California Insurance Code §§ 410-412 and 202-2053 and implied covenants of good faith and fair dealing.  The 20-21 Property Policies do not reflect an agreement to value any of SMV's Covered Property at a specific sum.

135.     The Insurer Defendants also dispute, pursuant to SMV's Covered Property definition, that they have a duty to cover and pay SMV's insurance benefits, losses, costs and expenses due to Fire-related damage to the Chevalier Red Barn, the La Perla Red Barn, 3-La Perla Farmhouse structures and SMV's trellises and irrigation systems.

136.     The Insurer Defendants are obligated to cover Covered Property in accordance with the terms, conditions, endorsements, exclusions, and limitations in their respective 20-21 Excess Property Policies.

137.     The Insurer Defendants also dispute SMV's Miravalle Shop's damages.

138.     The Insurer Defendants have denied any obligation to cover any additional loss under their respective 20-21 Excess Property Policies.

139.     As such, an actual and justiciable controversy exists between SMV and the Insurer Defendants concerning: (a) the application of (i) the Insurer Defendants' respective limitation of liability endorsements (if any) to their respective obligations to pay some or all of the remaining La Perla Historic Winery building and Alba Winery buildings #1-2 Fire-related loss or property damage; and (ii) First Specialty's Covered Property definition to the Insurer Defendants' respective obligations to cover and pay some or all of the Fire-related loss and damage to Chevalier Red Barn, the La Perla Red Barn, 3-La Perla Farmhouse structures and SMV's trellises and irrigation systems; and (b) all of the Miravalle Shop's loss or damages.

140.     SMV seeks a declaration from the Court as to the appropriate construction and meaning of the Insurer Defendants' 20-21 Excess Property Policies.  This includes a declaration regarding the parties' rights and obligations under the 20-21 Excess Property Policies, including that (a) the Insurer Defendants' respective limitation of liability endorsements do not bar SMV's recovery of its La Perla Historic Winery building and Alba Winery buildings #1-2 Fire-related loss or damage and that their proffered interpretation violates, among others, California public policy and is at odds

with California's Insurance Code; (b) the Chevalier Red Barn, the La Perla Red Barn, 3-La Perla Farmhouse structures and SMV's trellises and irrigation systems are all "Covered Property" under those Policies; (iii) all of the Miravalle Shop's damages are covered; and (iv) all SMV's 20-21 Property Policies should be interpreted to maximize SMV's recovery of its loss and damages sustained due to the Fire, including the 20-21 Excess Property Policies at issue.

141.   SMV also seeks a declaration that it is entitled to its attorney's fees, costs and expenses resulting from the Insurer Defendants' breaches.

**SECOND CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(Against the Insurer Defendants)**

142.   SMV incorporates by reference the preceding paragraphs as if fully set forth herein.

143.   SMV entered into legally binding written contracts with First Specialty and each of the Insurer Defendants.  SMV is the named "Insured" under each 20-21 Property Policy, including the 20-21 Excess Property Policies.

144.   SMV provided timely notice of its Fire-related claims to the 20-21 Property Insurers, including the Insurer Defendants.  SMV notified them that it made claims for insurance benefits, losses, costs, and expenses arising from the Fire.

145.   SMV has complied with the conditions and requirements of the 20-21 Property Policies and/or (a) such conditions and requirements have been waived; or (b) their satisfaction is otherwise excused by either operation of California public policy, statutes, regulation or law, or the Insurer Defendants' conduct.  The Insurer Defendants are estopped from asserting all contractual provisions, if any, that (i) purport to limit or otherwise negate their obligations to provide insurance benefits, losses, costs, and expenses under the 20-21 Excess Policies; (ii) purport to limit in any coverage terms, conditions or obligations not otherwise disclosed to SMV by the 20-21 Property Insurers before the July 1, 2020 policy period commenced; and/or (iii) are at odds with California

public policy, statutes, regulations or law that protect, among others, California policyholders and/or California properties.

146. SMV's Fire-related claims are covered under the 20-21 Property Policies as outlined herein and not excluded, including under each of the respective 20-21 Excess Property Policies. The 20-21 Property Policies also do not exclude or limit coverage for the damaged completed additions, fixtures including outdoors fixtures or permanently installed machinery and equipment including the trellises and irrigation systems. As such, all of this property is covered because the damages arose from a covered peril and was not otherwise excluded or limited.

147. Landmark and Kinsale breached their respective 20-21 first layer excess property policies because they refused to exhaust their respective $2.5 ($5 million together) policy limit and pay $2.4 million each ($4.8 million together) for SMV's Fire-related loss and damage at the La Perla Historic Winery building and $100,000 each ($200,000 together) for its Fire-related damage to Alba Winery Buildings #1-2.

148. Mt. Hawley has anticipatorily breached its 20-21 second layer excess property policy because it intends to, among other things, refuse to exhaust its $10 million policy limit and pay (i) at least $4.8 million for SMV's Fire-related loss and damage at the La Perla Historic Winery building and $341,474.47 for its Fire-related damage Alba Winery Buildings #1-2; and (ii) $5.2 million for SMV's Fire-related Covered Property loss or damage in a manner that maximizes SMV's total 20-21 Property Policies' coverage.

149. Hallmark Specialty and Western World anticipatorily breached their respective 20-21 third layer excess property policies because they have indicated that they will refuse to exhaust their respective $5 million policy (together $10 million) limit and pay $2.4 million each ($4.8 million together) for any Fire-related La Perla Historic Winery Covered Property loss or damage and $2.6

million each ($5.2 million) for any SMV Fire-related Covered Property loss or damage in a manner that maximizes SMV's total 20-21 Property Policies' coverage.

150.    AXIS also anticipatorily breached its 20-21 fourth layer excess property policy because it has indicated that it will refuse to exhaust its $5,565,435 policy limit and pay for any remaining Fire-related SMV Covered Property loss or damage in a manner that maximizes SMV's total 20-21 Property Policies' coverage.

151.    The Insurer Defendants' interpretation of their respective limit of liability provisions also violates, among others, their respective obligations pursuant to California Insurance Code §§ 410-412 and 202-2053 and implied covenants of good faith and fair dealing.  The 20-21 Property Policies do not reflect an agreement to value any of SMV's Covered Property at a specific sum.

152.    By failing and refusing to honor the 20-21 Excess Property Policies and paying their respective full limits of coverage or any insurance proceeds due to SMV, the Insurer Defendants have individually and collectively breached the Policies.

153.    As a direct and proximate result of such breaches, SMV has been deprived of the benefit of the Insurer Defendants' insurance coverage and have incurred damages in an amount to be proven at trial, but in no event less than the approximately $28 million still due under the 20-21 Excess Property Policies for SMV's Fire-related loss and damage to its Covered Property, plus its attorney's fees, costs and expenses.

**THIRD CAUSE OF ACTION**
**ALTERNATIVE BREACH OF CONTRACT**
**(Against the Insurer Defendants)**

154.    SMV incorporates by reference the preceding paragraphs as if fully set forth herein.

155.    For the 20-21 policy year, SMV submitted an application for slightly more than $36.6 million blanket open property coverage that provided the same material terms, conditions, endorsements, limitations, and/or exclusions as the 2019-20 Allianz property policies in force.

156.     During the underwriting, negotiation, and placement process, the 20-21 Property Insurers and their agents indicated that they would provide such coverage, subject only to the following changes: (i) the 20-21 Property Policies would not cover SMV's residential properties; (ii) the total aggregate commercial property coverage policy limit would be reduced to $35,565,435; (iii) the 20-21 Property Policies would be layered and include 9 separate insurers; (iv) the wildfire deductible would be raised to $500,000; and (v) SMV would pay a substantially higher premium.

157.     On information and belief, the 20-21 Property Insurers were obligated to provide blanket open property coverage and the 20-21 Property Policies must provide such coverage, including the 20-21 Excess Property Policies.

158.     The 20-21 Property Insurers also did not follow California Insurance Code §§ 410-412 and 202-2053 and the 20-21 Property Policies do not reflect an agreement to value any of SMV's Covered Property at a specific sum.

159.     First Specialty paid its $5 million limit to SMV for its Fire-related insurance claims. On information and belief, First Specialty never earmarked its $5 million payment because it knew SMV's loss was covered.

160.     Nonetheless, the Insurer Defendants now intentionally and willfully attempt, in bad faith, to push a purported interpretation of that 20-21 Property Policies' terms, conditions, endorsements, limitations, and exclusions that significantly deviate from the property coverages that they promised to SMV.  Their purported interpretation also is at odds with California Insurance Code (*see* §§ 410-412 and 202-2053), California public policy, and California law.

161.     Landmark and Kinsale breached their respective 20-21 first layer excess property policies because they refused to exhaust their respective policy limits in a manner at odds with their promise to provide $5 million in blanket open property coverage.

162.    Mt. Hawley anticipatorily breached its 20-21 second layer excess property policy because it intends to refuse to exhaust its $10 million policy limit to cover SMV's proven Covered Property insurance claims.

163.    Hallmark Specialty, Western World, and AXIS also have anticipatorily breached their respective 20-21 excess property policies because they have all indicated that they will refuse to exhaust their respective policy limits (together $15,565,435) and not pay SMV for its proven Covered Property insurance claims.

164.    By failing and refusing to honor the 20-21 Excess Property Policies' agreed terms, conditions, endorsements, limitation, and exclusions, the Insurer Defendants have individually and collectively breached their respective 20-21 Excess Property Policies and violated §§ 410-412 and 202-2053 of the California Insurance Code, California public policy, and California law.

165.    As a direct and proximate result of such breaches, SMV has been deprived of the benefit of the Insurer Defendants promised blanket open insurance coverage and have incurred damages in an amount to be proven at trial but in no event less than the approximately $28 million that remains unpaid and owed under the 20-21 Excess Property Policies' aggregate property policy limits, plus its attorney's fees, costs, and expenses.

### FOURTH CAUSE OF ACTION
### ALTERNATIVE DECLARATORY JUDGMENT
### (Against All Insurer Defendants)

166.    SMV incorporates by reference the preceding paragraphs as if fully set forth herein.

167.    An actual and justiciable controversy exists between SMV and the Insurer Defendants under the 20-21 Excess Property Policies as to, among other things, whether: (i) the 20-21 Property Insurers and their agents, without disclosing material changes before the start of the July 1, 2020 policy period, could alter any of the material terms, conditions, endorsement, limitations, and exclusions that they promised would remain; and (ii) the 20-21 Excess Property Policies must

comport to the original promised property coverage for SMV due to the Insurer Defendants' violations of their respective duties of good faith and fair dealing and California's Insurance Code, regulations, public policy and law.

168.    SMV seeks a declaration from the Court as to the appropriate construction and meaning of the Insurer Defendants' 20-21 Excess Property Policies.  This includes a declaration from the Court regarding the parties' rights and obligations under the 20-21 Excess Property Policies, including that, except as otherwise disclosed to SMV on or before July 1, 2022: (i) the Insurer Defendants cannot alter or otherwise vary any of the material terms, conditions, endorsements, limitations or exclusions that they promised would remain at least materially the same as those in the expiring 2019-20 Property Policies, including the Insurer Defendants' promise to provide blanket open property coverage; and (ii) SMV's 20-21 Property Policies should be interpreted to maximize SMV's recovery of its loss and damages sustained due to the Fire.

169.    SMV also seeks a declaration that it is entitled to its attorney's fees, costs and expenses resulting from the Insurer Defendants' breaches.

### FIFTH CAUSE OF ACTION
### BREACH OF THE IMPLIED COVENANT
### OF GOOD FAITH AND FAIR DEALING
### (Against all Insurer Defendants)

170.    SMV incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

171.    The Insurer Defendants are obligated under California law to honor the covenant of good faith and fair dealing implied in each of their respective 20-21 Excess Property Policies.

172.    The Insurer Defendants are required by law not to impair the SMV's rights, including their right to receive all available benefits under the 20-21 Excess Property Policies. The Insurer Defendants also are prevented from elevating their interests above SMV's.

173.    At all material times herein, the Insurer Defendants and their agents breached the covenant of good faith and fair dealing by, *inter alia*, the consciously and unreasonably:

    A.    Refusing to pay SMV's proven, covered losses.

    B.    Asserting baseless defenses that misrepresent the facts and pertinent policy terms, conditions, endorsements, limitations, and/or exclusions.

    C.    Refusing to respond to SMV's proven, covered losses in a timely manner.

    D.    Purposefully delaying submission of a coverage position.

    E.    Refusing to deliver promised policy coverage.

    F.    Failing to investigate or evaluate SMV's Fire-related insurance claims in good faith.

    G.    Failing to give SMV's interests at least as much consideration as the Insurer Defendants gave to their own interests.

    H.    Failing to adopt and implement appropriate standards for the prompt and fair investigation and processing of SMV's Fire-related insurance claims.

    I.    Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of SMV's Fire-related insurance claims even though liability was and is reasonably clear.

174.    Each of these actions violates not only the implied covenant of good faith and fair dealing, but also numerous applicable Insurance Codes and Regulations with respect to proper claims handling practices, including, without limitation, Cal. Ins. Code § 790.03(h).

175.    The Insurer Defendants' actions constituted an intentional effort to delay complying with their obligations under their respective 20-21 Excess Property Policies issued to cover the exact type of catastrophic fire loss SMV suffered here.

176.    The Insurer Defendants' individual and collective bad faith conduct has directly and proximately caused damage to SMV, including without limitation by losing the time value of the insurance proceeds needed to cover the Fire-related claims, sparking unnecessary litigation, and forcing SMV to incur unnecessary attorneys' fees and costs, including hiring counsel to pursue the Insurer Defendants and now file this action due to their unfair and deceptive investigation and wrongful, unreasonable denial of coverage.  The Insurer Defendants are legally obligated to pay all damages caused by their bad faith conduct.

177.    At all material times herein, the Insurer Defendants have engaged in the conduct discussed herein that was oppressive, fraudulent, and malicious within the meaning of Civil Code §3294, and the Insurer Defendants are liable for exemplary damages in an amount to be determined at trial, plus SMV's attorney's fees, costs and expenses.

**SIXTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**(Against all Insurer Defendants)**

178.    SMV incorporates by reference the preceding paragraphs as if fully set forth herein.

179.    On information and belief, the Insurer Defendants (and agents acting on their behalf) falsely represented that the 20-21 Property Policies provided $35,565,435 in aggregate blanket commercial property policy limit.  The policies, however, had far lower limits of liability based on the Insurer Defendants' limitation of liability endorsements added after the July 1, 2020 policy period commenced without prior disclosure to SMV.

180.    The Insurer Defendants (and their agents acting on their behalf) also made additional false representations as set forth herein, including that the 20-21 Excess Policies did not cover most of SMV's Fire-related loss and damages because (a) their respective limitation of liability endorsements do not require them to pay any of the La Perla Winery building and Alba Winery buildings #1-2 remaining Fire-related losses or property damage; (b) the Chevalier Red Barn, the La

42
Complaint

Perla Red Barn, 3-La Perla Farmhouse structures and SMV's trellises and irrigation systems are not "Covered Property;" and (c) the Miravalle Shop damages have been fully paid.

181.    Those representations were false, and Insurer Defendants (and their agents) knew or should have known that the representations were untrue when they were made.

182.    The Insurer Defendants (and their agents) intended to induce SMV to rely on the above-referenced representations as set forth herein to their detriment and SMV reasonably relied on the truth of these representations to its detriment.

183.    As a proximate result of the Insurer Defendants' (and their agents') acts, errors and omissions, SMV has incurred damages, attorney's fees, costs, and expenses.

184.    The Insurer Defendants are liable for SMV's damages in an amount to be determined at trial but no less than $28 million, plus SMV's attorney's fees, costs and expenses.

**SEVENTH CAUSE OF ACTION**
**NEGLIGENCE**
**(Against Defendant AJG and Smith)**

185.    SMV incorporates by reference the preceding paragraphs as if fully set forth herein.

186.    AJG was SMV's insurance broker of record before July 1, 2020 and represented SMV in relation to the negotiations, underwriting, and placement of its insurance policies, including policies part of its commercial and residential property program.   At all relevant times herein, Smith was SMV's account manager at AJG.

187.    For many policy periods preceding the July 1, 2020, policy period, SMV purchased property policies that provided an aggregate property program policy limit of slightly more than $36.6 million and "open" blanket coverage.  AJG secured this insurance coverage on SMV's behalf.

188.    As SMV's broker of record, AJG and its account manager Smith provided SMV with numerous insurance-related services, including: (a) placing, negotiating, and underwriting coverages in accordance with SMV's directives, needs, and expectations in a timely fashion and well in advance

of any renewal date; (b) communicating with SMV about coverages available or not available and advising SMV about possible alternative insurance programs designed to meet SMV's stated directives, needs and expectations so that any coverage decisions, if any, would be made with SMV's full knowledge and well in advance of any policy's purchase; (c) binding coverages that reflected SMV's final directives, needs, and expectations, after the discussing any coverage related issues; (d) analyzing binders to ensure that the policy binder reflects SMV's stated coverage directives, needs, and expectations, and informing SMV about any potential discrepancies; (e) contacting insurers about any policy binder terms, conditions, exclusions, endorsements, or limitations that are incorrect to make sure that the insurers correct any and all such errors; (f) securing and analyzing the policies to ensure that they reflect SMV's stated coverage directives, needs, and expectations, and informing SMV about any potential discrepancies; (g) contacting insurers about any policy terms, conditions, exclusions, endorsements or limitations that are incorrect to make sure that the insurers correct any and all such errors so that all coverages, at least, reflected SMV's insurance directives, needs and expectations; and (h) assisting SMV in all aspects of the claim process to ensure that SMV maximizes all coverages available to pay for its losses and damages resulting from a claim.

189.   SMV relied entirely on AJG and Smith for their insurance-related expertise, including AJG's expertise in relation to the placement, negotiation and underwriting of property insurance coverage.  SMV also exclusively relied on AJG and Smith to make sure that the policy binders and policies reflected the coverages that SMV authorized AJG and Smith to purchase on its behalf.

190.   For the policy period that commenced July 1, 2020, SMV requested that AJG and Smith secure for it approximately the same $36.6 million blanket property program coverages that were in place for the past 15-to-25-year period.  AJG and Smith agreed, and they submitted an application for open blanket property coverage on SMV's behalf that sought the same (if not better) material property coverages that SMV had in place for years.

191.    Prior to binding the 20-21 property policy coverages, AJG and Smith failed to inform SMV of any material changes from the prior coverage other than the changes referenced above (*see, e.g.*, ¶ 56).  AJG and Smith told SMV that it secured open blanket property program coverages for SMV's commercial vineyard property for the July 1, 2020-July 1, 2021, policy period that were materially the same in all respects as (if not better than) those contained in the previous policies.

192.    On June 30, 2020, SMV asked AJG and Smith to confirm that it had secured $35,565,435 in open blanket commercial property coverage prior to authorizing AJG and Smith to bind the 20-21 property coverage.  Smith confirmed that she had secured that property coverage for SMV and, except for the above-referenced changes, AJG and Smith assured SMV that the commercial property coverage was at least the same in all other material respects to the Allianz 2019-20 blanket property coverages in force until 11:59 pm PT that night.

193.    On information and belief, AJG and Smith did not adequately inquire, review, or understand the commercial property coverages that the 20-21 Property Insurers offered to provide to SMV on, before or after June 30, 2020.  AJG and Smith had not requested or received information that would help them ensure that the 20-21 commercial property coverage was the same in all other material respects to the Allianz's open blanket property coverage.

194.    Relying on their respective statements that it would receive commercial property coverage that was the same in almost all material respects to that in force for its commercial vineyard property, SMV agreed to bind coverage for the 20-21 property policies and, on July 2, 2020, SMV signed its Statement of Values.  Had SMV known that AJG and Smith had not, in fact, acquired the property coverage that it authorized them to bind, SMV would not have agreed to bind the 20-21 property policy coverages.

195.    On or about July 15, 2020, the 20-21 Property Insurers sent policy binders to AJG, who forwarded them to SMV.  AJG and Smith never reviewed the purported policy terms, conditions,

endorsements, exclusions, and limitations referenced in the binders.  Had AJG or Smith reviewed the binders, they would have seen that the 20-21 Property Insurers were not providing the same commercial property coverages to SMV that AJG and Smith told SMV that they had secured.

196.    Nor did they tell SMV that they had not reviewed the policy binders to confirm that the property coverage bound accurately reflected the open blanket property coverage that SMV authorized AJG and Smith to secure.

197.    At all relevant times, AJG and Smith knew and acknowledged that they had a duty to ensure that the binders and the policies reflected the coverages that AJG requested SMV to bind. AJG and Smith also knew that SMV relied on AJG and Smith to perform this critical evaluation and that SMV would reasonably assume unless they told it otherwise, that they performed their job, reviewed the binders and policies, and found that the policy binders and policies accurately reflected that SMV had received the open blanket property coverages.   SMV also reasonably assumed that AJG and Smith would, as part of their job, contact the 20-21 Property Insurers if any of the policy terms, conditions, endorsements, or exclusions were incorrect to have the Insurers make appropriate corrections.

198.    AJG and Smith unreasonably failed to review the binders, inform SMV of any errors, and contact the 20-21 Property Insurers or their agents to correct those errors before they issued the 20-21 Property Policies.   Despite acknowledging their duties to do so, no one at AJG, including Smith, reviewed the 20-21 Property Policies for accuracy or tried to have the 20-21 Property Insurers correct their terms, conditions, endorsements, limitations, or exclusions.

199.    The Insurer Defendants claim that the 20-21 Property Policies did not provide open blanket commercial property program coverage.  The Insurer Defendants contend that the 20-21 Property Policies limit coverage available to SMV for Fire-related damage to its alleged total value listed on SMV's Statement of Values.  The Insurer Defendants also claim that First Specialty's

Covered Property definition does not cover SMV's trellises and irrigation systems or many of the buildings and structures damaged by the Fire.  As a result, the Insurer Defendants claim that the 20-21 Property Insurers have no obligation to pay SMV more than $7,659,534.86 for its Fire-related claims and they have refused to pay SMV $28 million for its Fire-related claims.

200.   As its insurance broker, AJG owed SMV a duty to perform their work professionally and with the skill, prudence, and diligence that members of their profession commonly possess and exercise.

201.   At all relevant times herein, AJG and Smith consciously and/or unreasonably failed to perform their duties as SMV's insurance broker and account executive in several ways.  First, AJG and Smith made no attempt to ensure that they obtained the open blanket property coverage that SMV requested and authorized it to obtain on its behalf.

202.   Second, AJG and Smith failed to seek information about the coverages that they obtained before they informed SMV that they, in fact, had obtained the very coverage that SMV requested in all material respects except for four (4) disclosed changes (*see* ¶ 56).

203.   Third, AJG and Smith failed to investigate the availability of open blanket property coverage for SMV.   In fact, AJG and Smith failed to advise SMV that blanket coverage was unavailable or otherwise provide SMV with any notice that blanket coverage may be difficult to acquire.

204.   Fourth, had AJG and Smith found that open blanket coverage was unavailable, they failed to advise SMV to: (i) significantly increase its badly outdated individual property values on SMV's Statement of Values to cover the full value of their buildings, structures and other covered property in the event of loss or damage; (ii) list separately more buildings or structures on its Statement of Values or request to endorse and broaden the First Specialty Covered Property definition if necessary.  Clearly, AJG and Smith recommending that SMV try to obtain these and/or

other changes in the 20-21 Property Insurers proposed property policy coverages would have helped SMV to obtain both the coverages that it sought and that its lender required.

205.    Fifth, AJG and Smith failed to (a) review the binders and policies provided; and (b) request that the 20-21 Property Insurers and their agents make appropriate and necessary corrections. Indeed, many of the 20-21 Property Policies' coverage terms, conditions, endorsements, limitations, and exclusions do not provide the same level of commercial property coverage that SMV had in its earlier property policies.

206.    Finally, AJG and Smith failed to help SMV maximize any coverage available for its Fire-related claims.  Instead, AJG and Smith abdicated this responsibility and ignored all of SMV's requests.

207.    AJG's and Smith's above describe acts, errors and omissions constitute a breach of their duties to SMV.

208.    As a direct and proximate result of AJG's negligent procurement of SMV's 20-21 commercial property coverages and the 20-21 Property Policies, the Insured Defendants have denied coverage and have not agreed to cover the full scope of SMV's losses resulting from Glass Fire.  To the extent that the Insurer Defendants are not required to pay any more of SMV for its Fire-related claims, AJG and Smith are obligated to pay AMV for its Fire-related claims not covered as a result of their negligence.  SMV's damages as a result of AJG's and Smith's negligence are likely between $6 million and $28 million depending, in part, on what the Insurer Defendants pay to SMV for its Fire-related claims.

209.    SMV is entitled to damages in an amount to be determined at trial, plus attorney's fees, costs and expenses.

**EIGHTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**(Against AJG and Smith)**

210.     SMV incorporates by reference the preceding paragraphs as if fully set forth herein.

211.     AJG and Smith made the above-referenced representations to SMV, including that they secured (a) an open blanket property program for SMV for the July 1, 2020-July 1, 2021 policy period that except for the disclosed changes (*see, e.g.,* ¶ 56), had in all material respect to the same (if not better) policy coverages than those in Allianz's earlier property policies; and (b) the open blanket property policies and coverages were what SMV requested for that policy period. These representations, including factual misrepresentations about the policies, were false and untrue, and AJG and Smith knew or should have known that the representations were untrue when they were made.

212.     Defendants AJG and Smith intended to induce SMV to rely on the representations to bind the 20-21 property coverages, and SMV reasonably relied on the representations to their detriment.

213.     As a proximate result of AJG's and Smith's acts, errors and omissions, SMV has incurred damages in an amount to be determined at trial but in no event less than $6 million, plus attorney's fees, costs, and expenses.

**NINTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(Against AJG and Smith)**

214.     SMV incorporates by reference the preceding paragraphs as if fully set forth herein.

215.     AJG and Smith breached their fiduciary duties to SMV by, *inter alia,* failing to secure open blanket property coverage, making false statements and misrepresentations, failing to review the binders and policy terms, failing to advise SMV of any such review, failing to advise that additional documentation was necessary or advisable (such as an updated statement of values) if open blanket

coverage was not available, and failing to communicate what coverage had been provided, what coverage had been declined, and what steps needed to be taken to obtain the coverage that SMV had requested.

216.    SMV has been damaged in an amount to be proven at trial  as the result of such breaches of fiduciary duty.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Spring Mountain Vineyard, Inc. prays for the following relief

A.      Entering a declaration as to the appropriate construction and meaning of the 20-21 Excess Property Policies and the disputed terms, conditions, endorsements, exclusions and/or limitations.  This includes a declaration of SMV's and the Insurer Defendants' respective rights and obligations under the 20-21 Excess Property Policies, including : (a) whether the 20-21 Property Policies (including the 20-21 Excess Property Policies provide open $35,565.435 aggregate commercial blanket property coverage for any of SMV's Fire-related Covered Property loss or damage; (b) the application of (i) the Insurer Defendants' purported respective limitation of liability endorsements (if any) to their respective obligations to pay some or all of the remaining La Perla Historic Winery building and Alba Winery buildings #1-2 Fire-related loss or property damage; and (ii) the First Specialty's Covered Property definition to the Insurer Defendants' respective obligations to cover and pay some or all of the Fire-related loss and damage to Chevalier Red Barn, the La Perla Red Barn, 3-La Perla Farmhouse structures and SMV's trellises and irrigation systems; and (c) all of the Miravalle Shop's loss or damages.

B.      Award SMV its actual and consequential damages sustained as a result of the Insurer Defendants' individual and collective breaches of the 20-21 Excess Property Policies in an amount to be established through proof.

C.     Award SMV its actual, consequential, and punitive damages sustained as a result of the Insurer Defendants' individual and collective breaches of the implied covenant of good faith and fair dealing.

D.     Award SMV its actual and consequential damages sustained as a result of the Insurer Defendants' negligent misrepresentations.

E.     Award SMV its actual and consequential damages sustained as a result of AJG's and Smith's negligence.

F.     Award SMV its actual and consequential damages sustained as a result of AJG's and Smith's negligent misrepresentations.

G.     Enter a judgment awarding SMV pre-judgment interest and post-judgment interest under applicable law.

H.     Enter a judgment awarding SMV its attorneys' fees, costs, expenses, and any other and further relief to which they may justly be entitled.

**<u>JURY DEMAND</u>**

SMV hereby demands a trial by jury of all issues so triable that are raised herein, or which may be raised in this action.

Dated: March 11, 2022

By: /s/Jordan S. Stanzler
STANZLER LAW GROUP
Jordan S. Stanzler Bar No.54620
Jstanzler@stanzlerlawgroup.com
390 Bridge Parkway, Suite 220
Redwood City, CA 9406

COHEN TAUBER SPIEVACK & WAGNER, P.C.
Jay B. Spievack (*pro hac vice forthcoming*)
jspievack@ctswlaw.com
Jackson S. Davis (*pro hac vice forthcoming*)
Grace Guo (*pro hac vice forthcoming*)
420 Lexington Ave., Suite 2400
New York NY 10170-2499

*Counsel for Plaintiff Spring Mountain Vineyards, Inc.*

51
Complaint

# EXHIBIT 1

## SWORN STATEMENT IN PARTIAL PROOF OF LOSS

| ESP 2004861 00 | | See Below* |
|---|---|---|
| (POLICY NUMBER) | | Carriers |
| See Below* | | 001.024327.MI |
| (POLICY AT TIME OF LOSS) | | McLaren File Number |
| 7/1/2020 | | September 27, 2021 |
| (Date of Inception) | | Date of Loss |
| 7/1/2021 | | Arthur J Gallagher |
| (Date of Expiration) | | Broker |

At time of loss, by the above indicated policy of insurance you insured: Spring Mountain Vineyard Inc.

Against loss by **All Risk** to the property described according to the terms and conditions of the said policy and all forms,

1.   **Time and Origin**: An insurable loss occurred on **September 27, 2020**  The cause and origin of the said loss were: **Fire**

2.   **Occupancy**: The building described, or containing the property described, was occupied at the time of the loss as  follows and for no other purpose whatever: Winery

3.   **Title and Interest**: At the time of the loss the interest of your insured in the property described therein was **Owner**. No other person or persons had any interest therein or incumbrance thereon, except: MGG California LLC, as Collateral

4.   **Changes**: Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described, except: **None.**

5.   **Total Insurance**: The total amount of insurance upon the property described by this policy was, at the time of the loss, **as described more fully in the declaration page of the policies See Below***

| | | |
|---|---|---|
| 6.   The Actual Cash Value of said property at the time of the loss was: | | **Undetermined at this time** |
| 7.   **The Loss and Damage to Building:** | | **$38,532,411.11*** |
| 8.   **The Loss due to Business Interruption:** | | **TBD** |
| 9.   **The Amount Claimed under the above numbered policy is:** | = | $38,532,411.11 |
| 10. **Less Amount of Deferment / Holdback** | - | N/A |
| 11. **Actual Cash Value of Loss:** | | **TBD** |
| 12. **Less Amount of Deductible:** | - | TBD |
| 13. **Advance Payment** | - | **$7,508,855.85** |
| 14. **Net Remaining Balance including Withheld Depreciation** | = | **$31,023,555.26** |

The said ~~loss did not~~ originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made.  Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this Proof of Loss by the insured is not a waiver of any of its rights it may have under the policy or at law.

State of                                                                        Insured                                                          PRESIDENT
_ILLINOIS_                                                                                                                         SPRING MTN VINEYARD INC
County of   _COOK_
Subscribed and sworn before me this _____   day of _November_, 20_21_

_Christine Serdar_  Notary Public      My commission Expires _June 12, 2022_



CHRISTINE SERDAR
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
June 12, 2022

| DATE: 08/18/2021<br>INSURED:  Spring Mountain Vineyard, Inc.<br>DATE OF LOSS: September 27, 2020<br>CAUSE OF LOSS: CAT 2068 Glass Fire<br>LOSS LOCATION:  Per Schedule of Values<br>INSURERS FILE NUMBERS: Per SOI<br>MCLARENS FILE NO.: 001.024327.MI | STATEMENT OF LOSS - BUILDING ACV/RCV<br>and LOSS OF RENTS |
|---|---|

| LINE OF COVERAGE | | VALUE | LOSS | CLAIM |
|---|---|---|---|---|
| ITEM AS DESCRIBED: BUILDING | | | | |
| Loss as Determined: BUILDING | | | | |
| 1. BUILDINGS: | | | | |
| | | | | |
| La Perla Winery | | | | $  19,316,701.76 |
| La Perla House | | | | $    2,387,412.52 |
| 2.  REPAIR OF BUILDINGS | | | | |
|     A.  Building 4, Miravelle Mechanical Shop | | | | |
|         Less: Depreciation | | | | |
|         Building 4, Mechanical Shop ACV | | | | $       578,796.53 |
|     B.  Building 6, Miravelle Greenhouse | | | | |
|         Less: Depreciation | | | | |
|         Building 6, Miravelle Greenhouse ACV | | | | $       171,644.73 |
|     C.  Building 10, Alba Winery Buildings | | | | $       741,474.47 |
| La Perla Farmhouses - Total Loss | | | | $996,074.48 |
| Chevalier Red Barn - Total Loss | | | | $2,238,744.08 |
| La Perla Red Barn - Total Loss | | | | $    2,608,338.32 |
| 3.  CLEANING OF BUILDINGS | | | | |
|     A.  Building 1, Miravelle Winery/Office | | | | $       314,732.00 |
|     B.  Building 2, Miravelle Victorian House | | | | $       176,000.00 |
|     C.  Building 3, Miravelle Cottage | | | | $         33,000.00 |
|     D.  Building 4, Miravelle Mechanical Shop | | | | $         66,000.00 |
|     E.  Building 5, Miravelle Barn | | | | $         83,600.00 |
|     F.  Building 6, Miravelle Greenhouse | | | | $           9,900.00 |
|     G.  Building 7, Miravelle Cave | | | | $       442,398.00 |
|     H.  Building 8, Historic Winery | | | | $       292,600.00 |
| 4.  UNNAMED LOCATIONS | | | | $       100,000.00 |
| 5.  Young and Associates, Painting bid | | | | |
| 6. Cleaning BPP - See Breakdown Below | | | | $       787,692.35 |
| Trellis - Irrigation | | | | $    6,923,445.83 |
|     Painting at ACV | | | | $       263,856.04 |
| Building Claim at ACV Gross | | $            - | | $  19,215,709.35 |
| Less: Fire Occurrence Deductible | | | | $      (500,000.00) |
| Building Claim at ACV Net | | | | $  18,715,709.35 |

INSURED:  Spring Mountain Vineyard, Inc.
DATE OF LOSS: March 8, 2021
Page 2 of 2

ITEM AS DESCRIBED: BUSINESS PERSONAL
PROPERTY ("BPP")
Loss as Determined: BPP
1.  BPP Cleaning

| | | | | | |
|---|---|---:|---|---:|
| a. | Building 1, Miravelle Winery, Office | $ | 85,836.00 | $ | 85,836.00 |
| b. | Building 2, Miravelle Victorian House | $ | 49,000.00 | $ | 49,000.00 |
| c. | Building 3, Miravelle Cottage | $ | 9,000.00 | $ | 9,000.00 |
| d. | Building 4, Miravelle Mechanical Shop | $ | 18,000.00 | $ | 18,000.00 |
| e. | Building 5, Miravelle Barn | $ | 22,800.00 | $ | 22,800.00 |
| f. | Building 7, Miravelle Cave | | | | |
| | 1.  Cleaning Barrels | $ | 306,030.94 | $ | 306,030.94 |
| | 2.  Cleaning Inventory | $ | 176,371.41 | $ | 176,371.41 |
| | 3.  Cleaning General | $ | 120,654.00 | $ | 120,654.00 |
| | | $ | 787,692.35 | $ | 787,692.35 |